Nicole Lavallee (SBN 165755)
Caitlyn Barresi (357977)
**BERMAN TABACCO**
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
nlavallee@bermantabacco.com
cbarresi@bermantabacco.com

*Attorneys for Plaintiff Employees' Retirement System of the State of Rhode Island*

[Additional counsel on signature page]

Julie Goldsmith Reiser (*pro hac vice* forthcoming)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave, N.W., 8th Floor
Washington, DC 20005
Telephone: (202) 408-4600
jreiser@cohenmilstein.com

*Attorneys for Plaintiff Bucks County Employees' Retirement System*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| EMPLOYEES' RETIREMENT SYSTEM OF THE STATE OF RHODE ISLAND and BUCKS COUNTY EMPLOYEES' RETIREMENT SYSTEM, Derivatively on Behalf of SUPER MICRO COMPUTER, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>CHARLES LIANG, SARA LIU, WALLY LIAW, SHERMAN TUAN, JUDY LIN, TALLY LIU, ROBERT BLAIR, DANIEL FAIRFAX, DAVID E. WEIGAND, GEORGE KAO, and DON CLEGG,<br><br>Defendants,<br><br>and<br><br>SUPER MICRO COMPUTER, INC.,<br><br>Nominal Defendant | Case No. _______________<br><br>**CLASS ACTION**<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS


I. PRELIMINARY STATEMENT ..... 2

II. JURISDICTION AND VENUE ..... 5

III. PARTIES ..... 6

A. Plaintiffs ..... 6

B. Nominal Defendant ..... 6

C. Officer Defendants ..... 6

D. Non-Management Director Defendants ..... 8

E. Former Non-Management Director Defendant ..... 8

F. Non-Party Board Members ..... 9

G. Non-Defendant Related Parties ..... 9

IV. FACTUAL ALLEGATIONS ..... 12

A. SMCI and Its Business ..... 12

1. SMCI's Business and Rapid Growth ..... 12

2. SMCI's Operation as a Family Business Dominated by Its Co-Founder Liang ..... 13

B. SMCI's History of Misconduct Raised a Litany of Red Flags ..... 17

1. SMCI Pleaded Guilty to Violating Export Control Laws ..... 17

2. Prior to 2019, Management and the Board Utterly Failed to Oversee Related Party Transactions Until 2019 ..... 18

3. Nasdaq Delisted SMCI from 2018 through 2020 Due to SMCI's Inability to File Financial Statements that Could be Relied Upon ..... 19

4. SMCI Assured Investors That It Would Implement a Remediation Plan ..... 21

5. The SEC Imposed Cease and Desist Orders on SMCI and Hideshima 22

C. Defendants Failed to Redress the Issues Identified by the SEC and Engaged in Other Improper Practices ..... 26

1. Management Pushes the Board to Bring Back Terminated Employees Even Before Settling the SEC Investigation ..... 27

2. SMCI Hires EY as its Independent Auditor ..... 30

3. [redacted] ....... 30

4. SMCI's Former Head of Global Services Alleges that SMCI Engaged in Unlawful Accounting Practices ....... 36

5. Management Continues to Rehire Previously Terminated Employees, Which Reflects Continued Lack of Internal Controls and Increases the Risk to SMCI's Financial Statements ....... 40

6. [redacted] ....... 43

7. [redacted] ....... 44

8. EY Questions Management's Transparency and Advises Audit Committee that Completion of the Audit is at Risk ....... 44

9. With Its Year-End Audit at Risk, SMCI Scrambles to Assuage EY's Concerns and Form a Special Committee to Conduct an Internal Investigation ....... 46

D. The Audit Committee's Oversight Failures Lead to More Than a Billion Dollars of Transactions with the Liang Family Entities ....... 49

1. The Board and the Audit Committee Failed to Oversee the Implementation of an Adequate RPT Policy. ....... 49

2. The Audit Committee Ignores the Board's Own RPT Policy on Pre-Approved Transactions, Breaching Their Fiduciary Duty to the Company. ....... 53

3. The Audit Committee Failed to Adequately Oversee Billions of Dollars of Transactions Between SMCI and Liang-Family Entities ....... 57

E. Hindenburg Discloses to the Public Glaring Accounting Red Flags, Evidence of Undisclosed Related Party Transactions and Violations of Sanctions and Export Restrictions at SMCI ....... 62

1. Channel Stuffing and Accounting Violations ....... 63

2. Related Party Transactions with Entities Disclosed by SMCI as Related Parties ....... 64

3. Liquid Cooling Technologies ....... 64

4. Undisclosed Related Party Transactions ....... 65

5. Evading Sanctions and Export Restrictions on Russia ....... 66

F. Fallout from the Hindenburg Report at SMCI ....... 68

1. Regulatory [redacted] Scrutiny of Internal Controls Increase and SMCI Delays FY2024 Form 10-K Filing ....... 68

2. EY Resigns After Receiving the Special Committee's Interim Report [redacted] ........ 70

3. SMCI's New Auditor Identifies Continued Internal Control Issues Despite Final Report of Special Committee, but Signs Off on Company's Delayed Annual Report ........ 76

G. The Board and Audit Committee's Misconduct Has Caused Significant Injury to the Company ........ 86

H. The Special Committee's Final Report Suffered from Multiple Infirmities ........ 88

1. [redacted] ........ 88

2. [redacted] ........ 88

V. Insider Trading Allegations ........ 92

VI. Derivative and Demand Futility Allegations ........ 97

A. Demand on the Management Directors is Futile ........ 102

1. Charles Liang ........ 102

2. Sara Liu ........ 105

3. Wally Liaw ........ 105

B. Demand on the Audit Committee Director Defendants is Futile ........ 106

1. Tally Liu ........ 107

2. Robert Blair ........ 109

3. Judy Lin ........ 109

C. Demand on Sherman Tuan is Futile ........ 110

VII. COUNTS AGAINST DEFENDANTS ........ 111

VIII. PRAYER FOR RELIEF ........ 116

Plaintiffs Employees' Retirement System of the State of Rhode Island ("ERSRI"), Bucks County Employees' Retirement System ("Bucks County" and together with ERSRI, "Plaintiffs"), by and through their undersigned counsel, bring this action derivatively on behalf of Nominal Defendant Super Micro Computer Inc. ("SMCI" or the "Company") against certain current and former members of SMCI's Board of Directors (the "Board") and certain Executive Officers (together with the Board, the "Defendants"), seeking to remedy breaches of fiduciary duties and for insider trading, corporate waste and unjust enrichment.[1] Plaintiffs make these allegations upon personal knowledge as to the facts of their ownership of SMCI stock and upon information and belief as to all other matters, based upon counsel's investigation, including among other things, a review of: (a) internal books and records obtained pursuant to demands made under Del. Code Ann. tit. 8, § 220 (2025) (the "Books and Record Demands" and "Books and Records") produced subject to Confidentiality Agreements; (b) public filings by SMCI with the U.S. Securities and Exchange Commission ("SEC"); (c) press releases and other publications disseminated by the Company and certain non-parties; (d) news articles, shareholder communications and postings on SMCI's website; (e) the cease and desist proceedings and orders entered by the SEC against SMCI and a former Company executive, *In the Matter of Super Micro Computer, Inc.* (File No. 3-19927) ("SMCI SEC Order") and *In the Matter of Howard Hideshima* (File No. 3-19928) ("Hideshima SEC Order, and together with the SMCI SEC Order, the "SEC Orders"); (f) proceedings in other lawsuits and government proceedings involving SMCI's improper accounting practices and export control violations, including *In re Super Micro Computer, Inc., Securities Litigation*, No. 5:24-cv-06147-EJD (N.D. Cal.) and *Luong v. Super Micro Computer Inc.*, No. 5:24-CV-02440 (N.D. Cal.) ("*Luong* Lawsuit"); and (g) other publicly available information concerning SMCI and Defendants.

[1] Emphases have been added and quotations have been omitted throughout this Complaint unless otherwise indicated.

## I. PRELIMINARY STATEMENT

1. This is a derivative action arising from the mismanagement of a California headquartered publicly listed Delaware corporation, SMCI. Since the Company's founding, Defendants Charles Liang ("Liang"), his wife Chiu-Chu (Sara) Liu ("S. Liu") and their associate Yih-Shyan (Wally) Liaw ("Liaw") have operated the Company as a family enterprise notwithstanding SMCI's status as a public company. Acting through a board stacked with personal allies, they funneled billions of dollars in transactions through family-controlled entities while willfully failing to implement basic internal controls. They further caused the Company to rehire executives previously implicated in accounting misconduct, thereby reinstating individuals with a demonstrated willingness to disregard the law.

2. By embedding unlawful self-dealing into SMCI's core operations and consciously subordinating compliance to profit, Defendants knowingly caused the Company to violate the law, ignored repeated red flags and engaged in related party transactions that cannot survive scrutiny into the process leading to the transactions or the fairness of their terms.

3. SMCI was founded in 1993 in San Jose, California by Defendants Liang, S. Liu and Liaw. SMCI is a Silicon Valley-based company that engages in the business of providing "total IT solutions," particularly in the areas of artificial intelligence and high-performance computing, such as by providing servers and storage solutions.

4. From its founding until SMCI's initial public offering in 2007, SMCI was majority owned and controlled by Defendants Liang, S. Liu and Liaw, who together with their family members were able to operate SMCI without internal accounting controls or risk oversight systems. During this period, SMCI established various business relationships with other entities controlled by Liang, S. Liu and Liaw and their family members.

5. SMCI has ascended from a small start-up into a multi-billion-dollar public company with a global footprint. SMCI went public through an initial public offering ("IPO") in 2007. Following SMCI's IPO, its prior *modus operandi* was required to change. As officers and directors of a publicly held corporation, Defendants Liang, S. Liu and Liaw are obligated to operate the Company for the benefit of all stockholders, implement internal controls over financial

reporting, as well as to disclose related party transactions and ensure that those transactions are fair and transparent.

6. But despite its current size and scale, Defendants Liang, S. Liu and Liaw, have prevented SMCI from meeting these obligations. Instead, they installed a Board comprised of individuals with compromised independence, including Liang's business partners and close personal friends. These individuals then caused SMCI to enter into undisclosed related party transactions with entities controlled by Defendants Liang, S. Liu and Liaw. Making matters worse, SMCI's Board and senior management have failed for more than a decade to implement appropriate internal controls over its financial reporting or to police related party transactions, with these failures stemming back to at least 2015, including:

- SMCI restated its financial statements for 2015 through 2017 due to improper revenue recognition practices;
- SMCI was the target of an SEC investigation for its fraudulent accounting practices and eventually was forced to enter into a consent decree in 2020 with which the Company failed to comply;
- SMCI promised stockholders and the SEC that it would remediate internal weaknesses which led to the restatements, but has failed to do so;
- SMCI delayed the filing of its Form 10-K for fiscal year ("FY") 2017 for almost two years because it could not issue audited financial statements, which led to the delisting of SMCI stock from the NASDAQ;
- SMCI created a serious conflict in its oversight structure by combining the CFO and CCO positions into one;
- SMCI rehired numerous employees, without proper safeguards, who were terminated or had resigned due to their involvement in the improper revenue recognition practices;[2]
- The Board and the Audit Committee of the Board ("Audit Committee") failed to identify and scrutinize related party transactions leading to SMCI engaging in billions of questionable related party transactions with entities in which its CEO

---

[2] [redacted] ("Final Report") prepared by a Special Committee of the Board ("Special Committee"), [redacted]

and other co-founders have significant financial interests due to common ownership and family ties;

- SMCI entered into questionable transactions involving potential export control violations that were the subject of multiple whistleblower complaints;
- Management, the Board and the Audit Committee failed to implement adequate internal controls over SMCI's financial reporting despite being on notice of systemic failures; and
- The Board and the Audit Committee failed to implement an oversight system sufficient to detect and mitigate the risk of material weaknesses over internal controls and to prevent the issuance of misleading financial statements.

7. The Board and management's continuing failures have been so egregious that SMCI's independent auditor, Ernst & Young ("EY"), resigned before completing its audit for FY2024, stating that it was "[not] able to rely on management's and the Audit Committee's representations" and that it was "unwilling to be associated with the financial statements prepared by management."

8. Even SMCI's replacement auditor confirmed a series of material weaknesses in the Company's internal controls over its financial statements in connection with the FY2024 year-end audit, which, according to SMCI's recently filed FY2025 Form 10-K (filed August 28, 2025), still exist. Because of these continuing material weaknesses, SMCI has disclosed that "there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis."

9. Little doubt exists as to how the Company has repeatedly failed to establish adequate internal controls over its financial reporting, thereby operating in violation of an SEC cease and desist decree, SEC reporting regulations, SEC rules pertaining to related party transactions, and federal export control laws: the leadership of Defendant Liang—who has ignored internal control and compliance standards—coupled with the acquiescence of SMCI's Board and management. As the Company's Chairman, CEO and co-founder, Defendant Liang has dominated the business and operations of SMCI and has long eschewed compliance by, among other things, pressuring employees to improperly recognize revenue and aggressively pushing the rehiring of employees previously associated with the tainted financial statements.

10. Reining in management, including Defendant Liang, and establishing adequate internal controls fell squarely in the lap of the Board and Audit Committee. But between June 1,

2020 and the present (the "Relevant Period"), they utterly failed to protect the Company and stockholders' interests as multiple material weaknesses remain. Indeed, ten years after the first accounting misstatements, the Company's business and financial practices appear worse—not better.

11. Not only have Defendants failed the Company and its stockholders, but they have profited handsomely from their malfeasance. During the Relevant Period, Defendants sold over $98 million of their personal holdings of SMCI common stock while in possession of material non-public information regarding SMCI's business. Defendant Liang and his wife Defendant S. Liu sold over $53 million of SMCI common stock.

12. These breaches of fiduciary duty have already led to significant injury to the Company and are expected to result in substantial additional injury to SMCI.

13. The Board and Audit Committee's years-long failures are a breach of their fiduciary duties of oversight, making a demand on the Board futile because a majority of the Board faces a substantial likelihood of liability. Further, a majority of the Board is not disinterested because of their ties to Defendant Liang and their personal sales of SMCI common stock.

## II. JURISDICTION AND VENUE

14. This shareholder derivative action is brought pursuant to Fed. R. Civ. P. 23.1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Diversity jurisdiction is conferred because Plaintiffs and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs. Plaintiffs, residents of Pennsylvania and Rhode Island, respectively, assert claims against Defendants based in states such as California and Arizona. The claims herein highlight the national significance of systemic failures in ensuring adequate controls over financial reporting and compliance with federal export control laws, further reinforcing the federal court's jurisdiction.

15. This Court has personal jurisdiction over each of the defendants named herein. Nominal Defendant SMCI maintains and operates its principal executive offices in this District and Defendants maintain a place of business in or reside in this District or have sufficient

minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

16. Venue in this District is proper because Nominal Defendant SMCI is headquartered in this District. Further, a substantial portion of the transactions and wrongs complained of herein occurred in this District .

17. Divisional Assignment: This action should be assigned to San Jose Division of this Court, as the Company is headquartered in Santa Clara County, California, under Local Rule 3-2(c).

## III. PARTIES

### A. Plaintiffs

18. Plaintiff Bucks County is and was at all relevant times a stockholder of Nominal Defendant, SMCI.

19. Plaintiff ERSRI is and was at all relevant times a stockholder of Nominal Defendant, SMCI.

### B. Nominal Defendant

20. Nominal Defendant SMCI is incorporated in Delaware with its headquarters located at 980 Rock Avenue, San Jose, CA 95131.

### C. Officer Defendants

21. Defendant Liang founded SMCI in 1993 and has served as the Company's President, CEO and Chairman of the Board since its inception. Together with his wife, Defendant S. Liu, Defendant Liang holds 13.5% of SMCI stock. As the co-founder, CEO, president and Chairman of the Board, Liang holds an outsized influence over the Company and has positioned himself as the revered—and dominating—Chairman of the Board of Directors. Liang also has direct and indirect interests in the Liang Family Entities, as defined below. Defendant Liang resides in California.

22. Defendant S. Liu is Defendant Liang's wife and a co-founder of the Company. She has served as a Board member since the Company's inception and currently serves as a director and Senior Vice President ("SVP"). She has held a variety of positions with the Company,

including Treasurer from inception to May 2019, SVP of Operations from May 2014 to February 2018 and Chief Administrative Officer from October 1993 to May 2019. S. Liu also has direct and indirect interests in the Liang Family Entities, as defined below. Defendant S. Liu resides in California.

23. Defendant Liaw is a close personal friend of Liang and a co-founder of the Company. Since the Company's founding in 1993, Liaw has held a number of executive positions within the Company. From 1993 to January 2018, Liaw was a member of the Board. In January 2018, Liaw resigned from SMCI in the wake of a 2017 internal investigation into improper accounting practices at the Company ("2017 Internal Investigation"). Liaw returned to the Company in May 2021 as a consultant. In August 2022, Liaw returned to full-time employment as SVP, Business Development, and he was subsequently reappointed to the Board in 2023. Liaw also has direct and indirect interests in the Liang Family Entities, as defined below. Defendant Liaw resides in California.

24. Defendant David E. Weigand ("Weigand") was appointed as Chief Compliance Officer ("CCO") in May 2018 as part of the Company's purported remediation efforts following the 2017 Internal Investigation. In February 2021, SMCI announced that it had appointed Weigand as CFO following the resignation of the former CFO. Since February 2021, Weigand has held a dual CCO/CFO role. Defendant Weigand resides in California.

25. Defendant Don Clegg ("Clegg") is the SVP of Worldwide Sales. He joined SMCI in April 2006 and was previously VP of Marketing and Worldwide Business Development at SMCI. Defendant Clegg resides in California.

26. Defendant George Kao ("Kao") is the SVP of Operations. He joined SMCI in October 2021 and was previously VP of Operations at SMCI. Defendant Kao resides in California.

27. Defendants Liang, Liaw, S. Liu, Weigand, Clegg and Kao are collectively referred to herein as the "Officer Defendants."

### D. Non-Management Director Defendants

28. Defendant Robert Blair ("Blair") has served on the Board since December 2022 and is a member of the Audit Committee and the Nominating & Corporate Governance Committee ("Governance Committee"). Defendant Blair resides in Arizona.

29. Defendant Judy Lin ("Lin") has served on the Board since April 2022 and is Chair of the Governance Committee. Between May 2024 and sometime in the first half of 2025, Lin was on the Audit Committee. Lin is also a personal acquaintance of Liang. Defendant Lin resides in California.

30. Defendant Tally Liu ("T. Liu") has served on the Board since 2019 and is the Chair of the Audit Committee and a member of the Compensation Committee. T. Liu is a longtime personal friend of Defendant Liang. Defendant T. Liu resides in California.

31. Defendants Blair, Lin and T. Liu are referred to herein as the "Audit Committee Director Defendants."

32. Defendant Sherman Tuan ("Tuan") has served on the Board since 2007 and is a member of the Compensation Committee and a member of the Governance Committee. Defendant Tuan resides in California.

### E. Former Non-Management Director Defendant

33. Daniel Fairfax ("Fairfax") was appointed to the Board on July 1, 2019. His term on the Board expired after the 2024 Annual General Meeting. While on the Board, Fairfax was a member of the Audit Committee and Compensation Committee. Defendant Fairfax resides in California.

* * *

34. Defendants Liang, S. Liu, Liaw, Blair, Lin, T. Liu, Tuan and Fairfax are collectively referred to herein as the "Director Defendants."

35. Together with the Director Defendants, Defendants Weigand, Clegg and Kao are collectively referred to herein as the "Defendants."

**F. Non-Party Board Members**

36. Susan Morgensen, also known as Susie Giordano ("Giordano"), was appointed to the Board on August 15, 2024. The Board appointed her to the Special Committee on August 16, 2024. Defendant Giordano is Chair of the Compensation Committee.

37. Scott Angel ("Angel") was appointed to the Board on March 31, 2025. Defendant Angel is a member of the Audit Committee. Prior to joining the Company, Angel served as an audit partner in Silicon Valley at SMCI's former independent auditor of twenty years Deloitte & Touche LLP ("Deloitte"), serving clients in the technology industry until his retirement in December 2017.

**G. Non-Defendant Related Parties**

38. Ablecom Technology Inc. ("Ablecom") is a Taiwan-based Liang Family Entity, as defined below. Founded in 1997 by two of Defendant Liang's three younger brothers, Steve (Jianfa) Liang and Bill (Jianda) Liang, Ablecom primarily manufactures server enclosures (chassis) for SMCI, providing product development, production, service, credit, product manufacturing, manufacturing services and lease agreements for warehouse space. Ablecom has produced chassis for SMCI at least since the SMCI's IPO in 2007, when SMCI entered into an automatically self-renewing Product Manufacturing Agreement with Ablecom ("Ablecom Manufacturing Agreement"), which was signed by Steve (Jianfa) Liang and then-SMCI CFO Howard Hideshima ("Hideshima").

39. According to SMCI's SEC filings [redacted] Steve (Jianfa) Liang is the CEO and largest shareholder of Ablecom. Steve (Jianfa) Liang recently increased his level of ownership of Ablecom: as of June 30, 2025, he and certain unnamed "family members" own approximately 35.0% of Ablecom stock, an increase from their 28.8% ownership as of June 30, 2023. Since at least June 30, 2023 and through June 30, 2025, Defendants Liang and S. Liu have owned 10.5% of Ablecom shares.[3] In addition, [redacted], a sibling of co-founder Defendant Liaw, owned 11.7% of Ablecom as of June 30, 2024 and June 30, 2025. SMCI

---

[redacted]

has also disclosed in its SEC filings that Bill (Jianda) Liang is a director of Ablecom, [redacted]

40. [redacted]

41. Compuware Technology, Inc. ("Compuware") is another Liang Family Entity, founded in 2004 by Defendant Liang's brother, Bill (Jianda) Liang. According to SMCI's SEC filings, Compuware engages in design activities, and also manufacturers power supplies and motherboards, backplanes and other components used on printed circuit boards for SMCI. Meanwhile, SMCI sells Compuware components needed for manufacturing. Compuware is also a non-exclusive authorized distributor of SMCI's products in Taiwan, China and Australia. Since 2018, SMCI has made $1.5 billion worth of purchases from Compuware, while selling Compuware $261 million worth of products.

42. According to SMCI's SEC filings [redacted] Bill (Jianda) Liang is Compuware's CEO and the Chairman of Compuware's Board of Directors [redacted].[4] In addition, Defendant Liang's first brother, Steve (Jianfa) Liang is a director [redacted];[5] [redacted] a sibling of Defendant Liaw, owns approximately 8.7% of Compuware's capital stock; [redacted]. Through Ablecom's ownership of Compuware, Defendants Liang and S. Liu hold an indirect stake in Compuware.

---

[4] Bill (Jianda) Liang's Compuware ownership is comprised of his personal stake and his indirect stake through Liang Family Entity Ablestnet Computer Inc. ("Ablestnet Computer").

[5] Steve (Jianfa) Liang's indirect ownership of Compuware is through his ownership in and control of entities including Jie Teng Investment Co., Ltd (13.85% owner of Compuware), Yi Zhan Investment Co., Ltd (11.35% owner of Compuware) and Wei Chen International Investment Co., Ltd. (9.00% ownership of Compuware).

43. [redacted]

44. Leadtek Research, Inc. ("Leadtek"), another Liang Family Entity, is a Taiwanese company that specializes in professional graphics cards and workstation solutions and is an authorized reseller of SMCI products. SMCI also sells servers to Leadtek, and SMCI purchases graphics cards from Leadtek. Defendant Liang's first and second brothers, Steve (Jianfa) Liang and Bill (Jianda) Liang, have been directors of Leadtek since December 2023.

45. In October 2023, Ablecom and Compuware acquired a 30% interest in Leadtek. Leadtek's 2023 Annual Report specified that Ablecom owned 19.85% of Leadtek and Compuware owned 9.93% of Leadtek as of April 14, 2024. After Ablecom and Compuware's investment, Steve (Jianfa) Liang and Bill (Jianda) Liang were appointed to Leadtek's Board of Directors on December 27, 2023.

46. The family of Defendants Liang and S. Liu and the family of Defendant Liaw [redacted]

47. In December 2024, Leadtek announced that its new president was Jerry (Chuanjie) Liang, who is Steve (Jianfa) Liang's oldest son, and thereby Defendant Liang's nephew. Further, according to a translation of a 2024 article in Taiwan news source 財訊快報, Leadtek's chairman, Kun Shan Lu and Defendant Liang are decades-old friends.

48. Other Liang family businesses are part of SMCI's supply chain, including: Taiwan entity Ableplus Precision Industry Inc. ("Ableplus"), which is controlled by Steve (Jianfa) Liang through Ablecom's 90% ownership; Hong Kong entity Ablestnet Technology Limited ("Ablestnet Technology") and Taiwan entity Ablestnet Computer, which are controlled by Bill (Jianda) Liang, who is a director and 17% shareholder of Ablestnet Computer and a 20% owner of Ablestnet Technology; Taiwan entity Aeon Lighting Technology Inc. ("ALT"), which is controlled by Defendant Liang's third younger brother James (Jianguo) Liang, who is ALT's CEO and 85.7% owner; and Taiwan entity Aeon Future Technology Inc. a/k/a Aeon AI Technology Co., Ltd. a/k/a Hongguo Technology Co. or Hongkwang Technology (f/k/a Aeon

Biotechnology a/k/a Hongguo Biotechnology Co.) ("Aeon Technology"), which is controlled by James (Jianguo) Liang, who is the Chairman and owns 99% of Aeon Technology.

49. Ablecom, Compuware, Leadtek, Ableplus, Ablestnet Technology, Ablestnet Computer, ALT and Aeon Technology and are collectively referred to herein as the "Liang Family Entities."

## IV. FACTUAL ALLEGATIONS

### A. SMCI and Its Business

#### 1. SMCI's Business and Rapid Growth

50. Founded in 1993, SMCI is a global technology company based in San Jose, California and incorporated in Delaware that designs, manufactures and sells server and storage solutions for various markets, including enterprise data centers, cloud computing, artificial intelligence, 5G and edge computing.

51. Since its founding, SMCI has scaled from being a startup with three people in a garage to a multi-billion-dollar company with a global footprint. The Company went public in 2007, when it was listed on Nasdaq via a $64 million Initial Public Offering. Between 2007 and 2020, SMCI was the fastest-growing IT infrastructure company in the world, with its annual revenue reaching $3.34 billion in 2020.

52. During the Relevant Period, SMCI's massive growth was powered primarily by an increasing demand for Graphic Processing Units ("GPUs"), high performance computing and rack-scale solutions, particularly for data centers and AI applications. SMCI's market cap increased by approximately 16 times between December 31, 2021 and August 23, 2024, from $2.2 billion to $35 billion. Between 2023 and 2024, SMCI saw a 110% year over year increase in revenue growth. In March 2024, SMCI was added to the S&P 500, and was included in the Nasdaq 100 in late July 2024. That same year, Defendants Liang and his wife S. Liu made their first appearance on Forbes' billionaires list.

53. SMCI's growth also manifested in an increasingly global footprint, with factories and development labs opening in the decades following its founding, such as in the Netherlands, Taiwan and Malaysia.

### 2. SMCI's Operation as a Family Business Dominated by Its Co-Founder Liang

54. As the co-founder, CEO, president and Chairman of the Board, Defendant Liang holds an outsized dominance over the Company and the Board, such that the Board for years has abdicated its responsibility to act as a meaningful check on Liang's decisions.

55. Even in the face of SMCI's rapid scaling, Defendant Liang has remained in firm control over the Company, micromanaging its operations. A 2008 *New York Times* profile on Defendant Liang, titled, *Super Micro Computer: A One-Man, or at Least One-Family, Powerhouse*, explained that Liang "obsesses over every detail of the business, from approving the custom orders that are the company's specialty to dictating the environmentally themed, green neckties that executives wear to customer meetings." The article quoted several former employees as well as industry peers in describing the "cultish" "reverence" of Liang's leadership:

> "'He is the person who approves and looks at everything the company is doing – every new product, marketing effort, sales effort, anything you want to do or promote,' said Scott Barlow, who was manager of American sales at Super Micro before leaving to join Salesforce.com. 'He is kind of a one-man show.'"

56. Defendant Clegg was quoted in the article, stating, "It's almost as if Charles wills things to happen. . . . If he says a product will be on schedule, it will be on schedule. This is not driven on fear. It's driven on belief."

57. Yet, there are questions about Liang's judgment. An SVP with Intel Corporation described him as "very aggressive and motivated," stating, "[e]very once in a while, he appears on the verge of reckless." The Company culture also evidences Liang's stature as a dominant and controlling CEO and chair. Employees work up to 15-hour workdays, and according to the translation of a 2024 article in Taiwan news source *Business Today* (今周刊), Liang has been known to berate employees, including his brother, for being even thirty seconds late for a meeting.

58. Defendant Liang's control and dominance over the Company remained true through the time of an August 2024 report titled *Super Micro: Fresh Evidence Of Accounting Manipulation, Sibling Self-Dealing and Sanctions Evasion At This AI High Flyer* (the "Hindenburg Report") published by Hindenburg Research LLC ("Hindenburg"), which disclosed

that former employees attested that Defendant Liang "valued loyalty over all else" and that hiring at SMCI was the result of "nepotism."

59. Defendant Liang's control over SMCI was all-encompassing to the point that he "required employees to obtain his approval on virtually every business and accounting decision[]"—sometimes for amounts as low as $200—and that "[e]mployees were forced to stand in line outside Liang's office to obtain his signature and approval on [business and accounting] matters."[6] It is clear that even the smallest decisions at SMCI require Liang's consent and approval.

60. A defining feature of Liang's leadership has been the involvement of his family in running the business. Indeed, SMCI was established as a family business, having been co-founded by Defendants Liang and S. Liu. (Defendant Liaw, a good friend of Defendant Liang, was the third co-founder). At its inception, Liang was president and CEO of the Company, while S. Liu was the Treasurer and Chief Administrative Officer, roles she held until May 2019, at which point she became SVP of Operations. S. Liu functionally acts as SMCI's head of human resources.

61. In addition, SMCI has close business relationships with Taiwan- and Hong Kong-based companies controlled by Defendant Liang's three younger brothers Steve (Jianfa) Liang, Bill (Jianda) Liang and James (Jianguo) Liang, in what some news media have dubbed the "'Liang Brothers' supply chain."

62. According to a translation of a 2024 article from Taiwanese news source *Business Today* (今周刊), Defendant Liang's three younger brothers followed Defendant Liang into the electronics industry and became suppliers for SMCI. Per the article, as the second child but eldest son in his family, Defendant Liang has had a domineering role akin to a father amongst his siblings, and his brothers have long regarded him with awe and respect due to his strong sense of

[6] Consol. Amend, Compl. ¶¶ 56, 58, *In re Super Micro Computer, Inc., Securities Litigation*, No. 5:24-cv-06147-EJD (N.D. Cal. Sept. 22, 2025) (the "Securities Complaint" or "Securities Compl.").

discipline. As adults, such as during SMCI's early years, the Liang brothers reportedly have had a strong relationship that has played an important role in the entrepreneurial process.

63. When Defendant Liang founded SMCI, he asked two of his brothers, Steve (Jianfa) Liang and Bill (Jianda) Liang, to power SMCI's supply chain. Four years after SMCI's founding, in 1997, Steve (Jianfa) Liang and Bill (Jianda) Liang created manufacturing subsidiary Ablecom in Taiwan, which primarily manufactures server enclosures (also known as "server chassis"). A few years after the founding of Ablecom, in 2004, Bill (Jianda) Liang established Compuware, which acted as a power supply vendor for SMCI and produced titanium-level power supplies for servers.

64. Other than Ablecom and Compuware, whose related party status SMCI disclosed in its SEC filings during the Relevant Period, the Hindenburg Report stated that there were several other related parties with which Defendant Liang's three younger brothers were affiliated, but which SMCI had not disclosed as related parties in its SEC filings. These included Ablestnet Technology and Ablestnet Computer, both of which are controlled by Bill (Jianda) Liang; Leadtek, where Steve (Jianfa) Liang and Bill (Jianda) Liang are directors; and ALT and Aeon Technology, controlled by third brother James (Jianguo) Liang.[7] Though not mentioned in the Hindenburg Report, Ableplus is another Liang Family Entity controlled by James (Jianguo) Liang.

65. The relationship between the Liang Family Entities and each entity's Liang- (and Liaw-) related ownership is depicted below.

---

[7] Since the publication of the Hindenburg Report, SMCI has disclosed Leadtek and ALT as related parties.

[redacted]

66. As another example of the family dynamics at play in the business, in 2018 when he was in financial trouble, Defendant Liang personally borrowed approximately $12.9 million from Chien-Tsun Chang, the wife of his younger brother Steve (Jianfa) Liang. According to SMCI's public filings, the loan was originally made at Defendant Liang's request to provide funds to repay margin loans to two financial institutions, which loans had been secured by shares of the Company's common stock that Defendant Liang held. The lenders had called the loans in October 2018 following Nasdaq's suspension of SMCI's common stock from trading in August 2018 and the subsequent decline in the stocks' value the following month. As of June 30, 2025, the amount due on Defendant Liang's unsecured loan (including principal and accrued interest) had risen to $16.8 million. Importantly, Defendant's original margin loans were not in the best interest of the

Company because he used his Company stock as security creating a conflict of interest and violating SEC regulations. At least as early as October 2020, the Company's insider trading policy prohibited directors, officers and other employees from holding Company securities in a margin account or pledging Company securities as collateral for a loan.

**B. SMCI's History of Misconduct Raised a Litany of Red Flags**

67. In many ways, SMCI's management and governance was ill-prepared for the Company's meteoric rise, resulting in severe repercussions for the Company. However, as a result of numerous red flags that occurred prior to the Relevant Period, the Board and Audit Committee were on notice of the Company's need to comply with accounting regulations, export control laws and minimum standards for internal controls over financial reporting. These red flags included: the Company's earlier felony plea for export control violations, its conflict-ridden RPT Policy, its financial restatements, [redacted], the SEC investigation and the SEC Orders.

68. Notably, as described in further detail below, these red flags extend back decades, with an export control violation in 2006, and myriad unapproved related party transactions through 2019. In addition, many of the Company's internal control failures that gave rise to an accounting restatement in 2019 stem back to at least its 2015 financial statements, when the Board utterly failed to establish adequate oversight practices concerning financial reporting and related party transactions with the Liang Family Entities. The Board's failures caused the Company to miss SEC filing deadlines and the resignations and terminations of a swath of employees and managers [redacted] for accounting manipulations. At the end of 2018, SMCI's stock was suspended from trading and the Company was delisted from the Nasdaq. In addition, in 2020, the SEC charged SMCI and former SMCI CFO Hideshima with prematurely recognizing revenue and understating expenses over a period of at least three years, resulting in financial penalties for SMCI, Hideshima and Liang.

**1. SMCI Pleaded Guilty to Violating Export Control Laws**

69. In September 2006, before SMCI was listed, it pleaded guilty to a felony charge for exporting computer components to Iran in 2001 and 2002, which violated national security

laws. According to the Department of Justice, SMCI had sold 300 motherboards to a company in Dubai knowing the items were to be shipped to Iran, which was illegal at the time without a license. As a result of the plea agreement, SMCI was forced to pay a $150,000 fine, and would have been put on probation were it not for SMCI purportedly setting up an export control program in February 2004. However, according to a *New York Times* article, Defendant Liang attributed the failing to mere inexperience, stating "[w]e were a new company and didn't know every regulation," and promising that "[n]ow, we are well trained and watch over this 24 hours a day."

### 2. Prior to 2019, Management and the Board Utterly Failed to Oversee Related Party Transactions Until 2019

70. It is the responsibility of the CFO and the Audit Committee, and ultimately the Board, to monitor related party transactions. The SEC recognizes the importance of such monitoring. The SEC promulgated regulations in 2006 that require a publicly listed company to "[d]escribe the registrant's policies and procedures for the review, approval, or ratification of any [related person] transaction required to be reported" and provides detailed guidance for Companies to comply.[8]

71. Nevertheless, from the time of the Company's IPO in 2007 until 2019, the Company did not maintain a related party transaction policy even though the Audit Committee Charter includes a delegation for the Audit Committee to "[r]eview and approve any transactions between the Company and any related parties."

72. Any related party approval was reliant on self-reporting from director questionnaires and instructions for personnel to report "actual or potential conflicts" pursuant to the Company's Code of Business Conduct and Ethics.

73. Likewise, the Company's annual disclosures about how the Audit Committee reviewed related party transactions suggest that the Audit Committee conducted no independent investigation of the self-reported transactions:

---

[8] *See* 17 C.F.R. § 229.404(b) (2024) (citing 71 Fed. Reg. 53252 (Sept. 8, 2006) as amended at 73 Fed. Reg. 964 (Jan. 4, 2008)).

> In approving or rejecting a proposed transaction, or a relationship that encompasses many similar transactions, our Audit Committee will consider the relevant facts and circumstances available and deemed relevant, including but not limited to the risks, costs and benefits to us, the terms of the transaction, the availability of other sources for comparable services or products, and, if applicable, the impact on a director's independence. Our Audit Committee approves only those transactions that, in light of known circumstances are not inconsistent with our best interests, as the Audit Committee determines in the good faith exercise of its discretion.

74. SMCI's annual disclosures failed to state how often related party transactions were reviewed or approved by the Audit Committee and failed to describe, as is required by the SEC, "whether such policies and procedures are in writing and, if not, how such policies and procedures are evidenced."[9] Nor did the Audit Committee describe how or whether the transactions were in the Company's best interests.

75. Under this related party transaction regime, the Company misreported its relationships to related parties in the 2007 to 2019 period. For instance, SMCI completely failed to disclose its relationship with Compuware until the Company's 2010 annual disclosures, and when it did report the relationship, it concealed the true nature and quantity of business it conducted with Compuware.

### 3. Nasdaq Delisted SMCI from 2018 through 2020 Due to SMCI's Inability to File Financial Statements that Could be Relied Upon

76. On August 3, 2017, Super Micro filed a Form 8-K with the SEC, including its operating and financial results for the fourth quarter of FY2017. However, several weeks later, on August 29, 2017, SMCI announced in a Form 12b-25 that it would be unable to timely file its Form 10-K for the fiscal year ended June 30, 2017, which was due that day. SMCI did not file any annual or quarterly reports from the time it filed its Form 10-Q for the third quarter of FY 2017 until May 2019, when it restated its financials.

77. [redacted]

---

[9] 17 C.F.R. § 229.404(b)(1)(iv) (2024) (citing 71 Fed. Reg. 53252 (Sept. 8, 2006) as amended at 73 Fed. Reg. 964 (Jan. 4, 2008)).

[redacted]

78. In January 2018 [redacted] SMCI announced the resignations of CFO Hideshima, SVP of International Sales Defendant Liaw (also a Director), and SVP of Worldwide Sales, Phidias Chou ("Chou"). SMCI's press release did not comment on whether the resignations were related to the accounting missteps. In the same press release, SMCI announced the appointment of Kevin Bauer ("Bauer") as SVP and CFO and of Defendant Clegg as Chou's successor as interim worldwide sales leader.

79. [redacted] the Company allowed several employees to resign [redacted] including VPs of Sales, [redacted] and Peggy Lin (VP of Finance) [redacted]

80. According to a later-filed lawsuit against SMCI, SMCI had pushed for the so-called resignations of many employees identified in the paragraphs above because of their involvement in the unlawful accounting practices.[10]

81. Because SMCI was unable to file any financial statements for nearly two years, Nasdaq suspended the Company's stock from trading on the Nasdaq Global Select Market, effective August 23, 2018, and commenced delisting procedures. SMCI's share price plunged

---

[10] *Luong* Compl. ¶ 17.

21% in August 2018 to a to a five-year low. Nasdaq's Listing Council, to whom SMCI had appealed its suspension, affirmed the suspension and delisting on November 15, 2018, and on January 30, 2019, the Nasdaq Board of Directors declined the Company's request for additional review. After the delisting, the bank called Defendant Liang's margin loan secured with his SMCI stock and he borrowed $12.9 million from the wife of his brother Steve (Jianfa) Liang to repay the loan.

82. Worse yet, not only had SMCI blown past its filing deadlines, but it also found a multitude of issues across its previous SEC filings. On November 15, 2018, SMCI announced in a Form 8-K that its Board had determined that the Company's previously filed financial statements from fiscal years 2015 through 2017 could not be relied upon primarily due to revenue recognition errors. These "errors" included improper "quarter-end cut-off determinations and allocation of revenue determinations for customer contracts with service elements" and improper classification of inventory and products.

#### 4. SMCI Assured Investors That It Would Implement a Remediation Plan

83. Finally, on May 17, 2019, SMCI filed the Form 10-K for the fiscal year ended June 30, 2017 ("2017 Form 10-K"), which was signed by Defendants Liang, S. Liu, Tuan, T. Liu and certain other former directors. In the late-filed 2017 Form 10-K, SMCI assured investors and the public about the Company's commitment to improving its internal controls and implementation of a remediation plan, stating:

> Our management is committed to remediating identified control deficiencies (including both those that rise to the level of a material weakness and those that do not), fostering continuous improvement in our internal controls and enhancing our overall internal controls environment. Our management believes that these remediation actions, along with additional actions, when fully implemented, will remediate the material weaknesses we have identified and strengthen our internal control over financial reporting. We are committed to improving our internal control processes and intend to continue to review and improve our financial reporting controls and procedures.

84. The late-filed 2017 Form 10-K stated that its remediation actions included, among other things, "restructur[ing] [its] sales organization, which resulted in the resignations of the Senior Vice President of International Sales, the Senior Vice President of Worldwide Sales, the

Vice President, Strategic Accounts, the Vice President, Strategic Sales, the Vice President, Business Development and certain other sales personnel." SMCI touted that its remediation efforts included establishing a new CCO role (assumed by Defendant Weigand in May 2018), which was separate from the CFO role held by Bauer.

85. With SMCI's remediation plan ("Remediation Plan") in place, including having separate individuals acting as CFO and CCO, by January 2020, SMCI regained compliance to relist on Nasdaq. In SMCI's press release announcing the news, Defendant Liang falsely asserted that SMCI was "begin[ing] a new chapter" that was "based on improved internal controls":

> This marks our successful comeback and is the culmination of our efforts to become current with our SEC filings. We are pleased to begin a new chapter for Supermicro that is based on improved internal controls and a dedication to profitable growth. Not only are we back, but we are stronger, better, and re-energized to capitalize on the opportunities ahead.

**5. The SEC Imposed Cease and Desist Orders on SMCI and Hideshima**

86. Despite Defendant Liang's reassuring words to the public, later in 2020, SMCI was charged by the SEC for its improper accounting practices. On August 25, 2020, the SEC concluded that there had been widespread accounting violations at the Company and imposed cease and desist orders on SMCI and former SMCI CFO Hideshima.[11] The SEC Orders found that SMCI had prematurely recognized approximately $200+ million in revenue and understated expenses over the previous three years. These improper practices caused SMCI to file with the SEC materially misstated financial statements in its annual, quarterly and current reports during that period.

87. The SEC identified two primary problems with SMCI's accounting practices. First, the SEC found that "[SMCI]'s executives pushed employees to maximize end-of-quarter revenue and minimize expenses, without devising and maintaining sufficient internal accounting controls to record revenue and expenses in conformity with U.S. Generally Accepted Accounting

[11] Press Release, SEC, SEC Charges Super Micro and Former CFO in Connection with Widespread Accounting Violations (Aug. 25, 2020), https://www.sec.gov/newsroom/press-releases/2020-190 ("SEC Press Release").

Principles ('GAAP'). The SEC further explained that SMCI "improperly accelerated revenue recognition and reporting" by the following practices:

> (1) recognizing revenue before delivering the goods to customers; (2) sending goods to customers prior to the customer-specified delivery date; (3) improperly changing the shipment terms to a large Super Micro customer in order to recognize revenue upon shipment rather than when the goods were delivered to the customer; (4) recognizing revenue with respect to transactions that included customer acceptance terms before the customers had accepted the goods; (5) sending incomplete or mis-assembled goods to customers at the end of quarters; (6) recognizing revenue on sales to a large distributor upon shipment, when the revenue should have been recognized when Super Micro received payment from the distributor; (7) holding the bill of lading for certain overseas customers and thus preventing the customers from taking possession of the goods as a means to ensure payment, but nevertheless improperly recognizing the revenue upon shipment; and (8) recognizing certain extended warranty revenue at the time of sale, rather than amortizing the revenue over the length of the warranty.

88. Second, the SEC found that SMCI had understated certain expenses because (1) SMCI "improperly under-reported certain expenses by misusing its cooperative marketing program to pay a variety of unrelated expenses, such as warehousing costs for goods at quarter end, shipping costs, and product repair costs"; (2) SMCI employees "submitted claims for funds to which Super Micro was not entitled in connection with a vendor's cooperative marketing program"; and (3) SMCI "over-valued inventory and under-stated expenses by failing to reduce inventory and record an associated expense in instances where Super Micro no longer held the inventory for sale."

89. The SMCI SEC Order also noted that SMCI's FY2017 Form 10-K disclosed "numerous material weaknesses in its Internal Control over Financial Reporting" that "prevented Super Micro from recording transactions as necessary to permit the preparation of financial statements in conformity with GAAP." These material weaknesses were numerous and serious, including:

(a) Aggressively focusing on quarterly revenue without sufficient focus on compliance;

(b) A failure by senior management to establish and promote a control environment with an appropriate tone of compliance and control consciousness throughout the entire company;

(c) An inappropriate tone at the top; and

(d) A failure to hire personnel who had appropriate levels of knowledge and experience or to provide adequate training to its personnel.

90. Finally, the SMCI SEC Order recognized that SMCI was required to restate its financial statements included in SEC filings between fiscal years 2015 and 2017, as described *supra* Section IV.B.3.

91. As for Hideshima, the SEC held Hideshima partially responsible for the accounting improprieties at SMCI. Specifically, the Hideshima SEC Order stated:

> Hideshima pressed employees to maximize end-of-quarter revenue, without devising and maintaining sufficient internal accounting controls to record revenue in conformity with U.S. Generally Accepted Accounting Principles ("GAAP"). Hideshima was on notice that Super Micro employees engaged in a number of improper practices to accelerate revenue recognition and reporting, and he failed to adequately address the internal accounting control failures and stop these practices going forward.
>
> Hideshima also was responsible for certain accounting decisions that did not conform with GAAP. For example, Super Micro improperly recognized and reported revenue (a) upon a large shipment at quarter-end, when Hideshima was informed that Super Micro sent the wrong goods to a customer and had to perform significant work for months after the shipment to address the problem, (b) for sales to a large Super Micro distributor upon shipment, when Hideshima received information indicating that the revenue should have been recognized when Super Micro received payment from the distributor; and (c) upon shipment to certain overseas customers, despite Hideshima authorizing employees to hold bills of lading and thus preventing the customers from taking possession of the goods as a means to ensure payment.
>
> In addition, Hideshima knew that Super Micro was misusing its cooperative marketing program to pay a variety of unrelated expenses and, in certain instances, he proposed that co-op funds be used for non-marketing purposes, which caused Super Micro to understate these expenses. Furthermore, Hideshima implemented practices that caused Super Micro to over-value inventory and under-state expenses by failing to reduce inventory and record an associated expense when Super Micro no longer held the inventory for sale.
>
> From at least FY 2015 through FY 2017, Hideshima signed, and/or approved, annual, quarterly and current reports with the Commission that contained materially misstated financial statements.
>
> Hideshima's conduct violated certain internal accounting controls and books and records provisions under the Exchange Act, and caused Super Micro's reporting, books and records, and internal accounting control violations.

92. The SEC Orders resulted in payouts from SMCI, Hideshima and Defendant Liang. SMCI agreed to cease and desist from violating Sections 17(a)(2) and (3) of the Securities Act of 1933 and the reporting, books and records and internal accounting controls provisions of the Securities Exchange Act of 1934 and pay a $17.5 million penalty. Hideshima agreed to cease and desist from committing or causing violations of the reporting, books and records and internal

accounting controls provisions and pay disgorgement and prejudgment interest totaling more than $300,000 and a $50,000 penalty. Defendant Liang, while not formally charged by the SEC, agreed to reimburse SMCI $2.1 million for improper stock sale profits, further reflecting ongoing disregard of his fiduciary duties.

93. After settling the SEC charges, SMCI issued a press release that quoted Defendant Liang again affirming the Company's plans to implement remedial actions and enhance internal controls:

> "We are pleased to have settled this matter and put this investigation behind us," said Charles Liang, Chairman and Chief Executive Officer. "Supermicro is committed to conducting our business ethically and transparently. We fell short of our standards, and we have implemented numerous remedial actions and internal control enhancements to prevent such errors from recurring. Our strengthened financial accounting and management team will help us continue building value for shareholders and customers as we innovate in high-performance, high-efficiency server and cloud technology."

94. As a result of [redacted] the SEC Orders, Defendants were put on notice of the pervasive accounting issues at SMCI as well as the severity of the consequences. For instance, the SMCI Board at the time of the SEC Orders included Defendants who continued in their director positions through the time that the Hindenburg Report disclosed continued accounting violations and material internal control deficiencies—namely, Defendants Liang, S. Liu, Fairfax, T. Liu and Tuan. Further, Defendant Weigand was on notice, having been appointed as SVP, CCO in May 2018 [redacted]

95. However, Defendants did not end up taking their commitment to remediation seriously. As a harbinger of worse things to come, just six months after the settlement of the SEC Orders, in February 2021, SMCI announced in a press release that CFO Bauer had resigned, even though, according to former employees interviewed by Hindenburg, Bauer was key in fixing the Company's financials. In Bauer's place, the Company appointed Defendant Weigand as CFO, on top of his existing SVP and CCO positions—thereby creating a direct conflict-of-interest between his CFO and CCO roles. Any remediation was further undermined by the Company's efforts to rehire tainted employees previously purged following the restatement investigation. Indeed, according to former SMCI Head of Global Services Bob Luong, once Bauer was pushed out of

the Company, SMCI began recognizing revenue on hardware and service contracts as soon as the parts shipped, in violation of GAAP.[12]

**C. Defendants Failed to Redress the Issues Identified by the SEC and Engaged in Other Improper Practices**

96. Following [redacted] financial restatements, Nasdaq delisting and the SEC Orders, SMCI, its Board and its management, should have been on high alert for potential recidivism in improper financial controls and reporting. They were also legally obligated to do so as a condition for settling the SEC's charges. But Defendants instead reverted to malfeasance rather than adhering to their duties as officers and directors of a publicly traded company.

97. As described in further detail below, the directors and officers have continuously caused SMCI to violate its legal and financial accounting obligations. [redacted] Further, in violation of their legal obligations to the SEC, Defendants continued to engage in improper accounting practices and neglected to establish effective internal controls that would safeguard the Company. The abject failure of Defendants to heed the warnings from the Company's past [redacted] and was also revealed to the public in a complaint filed in April 2024 by SMCI's former Head of Global Services and the August 2024 Hindenburg Report. Both that complaint and the Hindenburg Report detailed SMCI's continuation of its original problematic accounting practices, the absence of effective internal controls and the Company's failure to meaningfully implement guardrails to prevent reversion to its old ways. Further, [redacted] the Hindenburg Report revealed that SMCI engaged in other improper practices to the detriment of the Company, namely, engaging in improper related party transactions and violating U.S. export controls—issues of which Defendants were aware.

---

[12] *See infra* ¶ 129 & n.22; Securities Compl. ¶ 89.

**1. Management Pushes the Board to Bring Back Terminated Employees Even Before Settling the SEC Investigation**

98. [redacted]

99. [redacted] Salim Fedel, who resigned in March 2018, [redacted] they rehired Salim Fedel; [redacted] A former executive interviewed by Hindenburg allegedly stated that Fedel "was involved with the restatement. He was one of the sloppy salespeople. He got fired because he was so aggressive."

100. [redacted]

101. [redacted]

[redacted]

102. [redacted] rehired Defendant Liaw as an independent contractor [redacted]

103. This is remarkable in light of former SMCI executives having told Hindenburg that Defendant Liaw presided over the sales teams that were involved in the previous accounting violations, stating, "[i]f you go back to Wally's team, every one of those [people] has their hand in that mess. You can promise yourself that." [redacted]

104. [redacted]

105. [redacted] SMCI rehired Peggy Lin as Chief Administrative Officer[13] [redacted] Phidias Chou [redacted] The Hindenburg Report noted

[13] *Luong* Compl. ¶ 24.

that while normally an accounting scandal would be the end of an executive's association with a firm, Chou attended an SMCI meeting with Defendant Liang where Chou was vaguely identified as "deputy CEO." [redacted]

106. [redacted] on December 8, 2023, Defendant Liaw was re-appointed to the Board despite his having circumvented the Audit Committee's reporting instructions. [redacted]

107. In this way, Defendant Liang used his dominance over the Board and Audit Committee to force the rehiring of the employees previously asked to resign [redacted] and SMCI's accounting restatement. For their part, the Board and Audit Committee failed to stand up to Liang and prevent the rehiring efforts. [redacted] Indeed, according to Mr. Luong, when SMCI rehired these employees, the rehired [redacted].[14]

108. [redacted]

[14] Securities Compl. ¶ 55; *see infra* ¶¶ 128-29.

[redacted] Indeed, at least until November 27, 2024 the Board failed to replace the General Counsel and otherwise maintained a legal department that was not equipped to deal with the issues facing SMCI given the size and complexity of its business, giving Defendants Liang, S. Liu, Liaw and other rehires the opportunity to operate with less oversight.

**2. SMCI Hires EY as its Independent Auditor**

109. In early 2023, SMCI decided to retain a new independent accounting firm to audit its financial statements for FY 2024, which began on July 1, 2023 and ended June 30, 2024. On March 9, 2023, the Audit Committee approved the engagement of audit firm EY, [redacted]

110. [redacted] None of this was true.

**3. [redacted]**

111. EY would never end up completing an audit for the Company. As EY soon learned, SMCI had had no intention of reining in Defendant Liang's desire to pursue improper sales tactics and in practice, internal controls that supposedly existed were non-functional. [redacted]

112. [redacted]

113. [redacted]

114. [redacted]

115. [redacted]

116. [redacted]

117. [redacted]

118. [redacted]

[redacted]

119. [redacted]

120. [redacted]

121. [redacted]

[redacted]

[redacted]

122. [redacted]

---

[redacted] [redacted]

123. [redacted]

124. [redacted]

125. [redacted]

[redacted]

126. [redacted]

**4. SMCI's Former Head of Global Services Alleges that SMCI Engaged in Unlawful Accounting Practices**

127. For the most part, particularly against the backdrop of the SEC Orders, the delisting of SMCI's stock and the Company's assertions of implementing a remediation plan, the public was unaware of the Company's ongoing internal control problems. However, on April 24, 2024, Mr. Luong brought a lawsuit alleging that he was retaliated against and ultimately fired by SMCI for reporting the Company's improper accounting practices after its stock was relisted in 2020. In December 2024, Mr. Luong filed a second amended complaint,[16] whose claims therein were sustained by a Court in this district after a motion to dismiss.[17]

---

[16] Second Amend. Compl., *Luong v. Super Micro Computer & Charles Liang*, 5:24-CV-02440 (N.D. Cal. Dec. 16, 2024) ("*Luong* Complaint" or "*Luong* Compl.")

[17] Order Denying Motion to Dismiss, *Luong v. Super Micro Computer, Inc.*, No. 24-cv-02440 (BLF) (N.D. Cal. June 17, 2025) (ECF No. 66).

128. In the *Luong* Complaint, Mr. Luong alleged that although SMCI and Defendant Liang "appeared to curtail [their] unlawful activities for a brief period during and following the SEC enforcement action . . . just weeks after the SEC cease and desist orders were issued… Defendants [began] engaging in conduct that [Mr. Luong] reasonably believed violated a number of SEC rules."[18] On September 22, 2025, Lead Plaintiffs in *In re Super Micro Computer, Inc., Securities Litigation*, No. 5:24-cv-06147-EJD (N.D. Cal. Sept. 22, 2025) currently before this Court, filed the Securities Complaint and named Mr. Luong as a witness. Mr. Luong provided further factual allegations beyond the *Luong* Complaint.[19]

129. From 2015 until approximately mid-2022, Mr. Luong routinely interacted with Defendant Liang while managing a team of over eighty individuals. During that time, Liang rarely delegated authority and required Mr. Luong to gain Liang's in-person signature for various pricing and sales paperwork.[20] Through his position and personal interactions, Mr. Luong alleged that Defendants engaged in improper revenue recognition, such as by recognizing incomplete sales and shipping products with known issues—i.e., more of the same that had subjected SMCI to the SEC Orders in the first place.[21] Mr. Luong explained that Defendant Liang directly approved premature revenue recognition of hardware-and-services sales before the equipment was installed to inflate financials particularly at quarter-end.[22] In addition, Mr. Luong recalled

[18] *Luong* Compl. ¶¶ 16, 18.

[19] *See generally* Securities Compl. Mr. Luong has confirmed to Plaintiffs in the instant matter that the allegations contained in the Securities Compl. are accurate.

[20] Securities Compl. ¶ 58.

[21] *Luong* Compl. ¶¶ 19-24.

[22] Securities Compl. ¶ 61. Mr. Luong also recalled an email he had received that was also addressed to Defendants Weigand and Liang that illustrated that SMCI improperly recognized revenue "to help our own quarter end shipment/rev[enue]" even though onsite installation had not occurred. Securities Compl. ¶ 72 (emphasis omitted).

that Liang threatened employees with disciplinary action if they submitted write-offs for overvalued inventory, which would directly affect SMCI's financials.[23]

130. Luong alleged that SMCI circumvented internal accounting controls because, among other things: Defendant S. Liu returned to an active management role within the Company; Defendant Weigand acted as both CFO and CCO; and beginning around March 2021, SMCI began to rehire employees associated with prior unlawful accounting activities.[24] Mr. Luong further alleged that he reported concerns about SMCI overstating revenue, such as improperly recognizing $10 million in revenue from an IBM contract, up the chain in 2020, culminating in reports to SMCI's CFO in December 2020 and January 2021 as well as to Defendant Liang.[25]

131. Then, in early 2021, Defendant Liang ordered the accounting team, including Defendant S. Liu, in conjunction with Mr. Luong's team, to "figure out" the actual cost of services for SMCI's largest existing customers by revenue.[26] When the accounting team determined that the actual cost was approximately 3.4%, Defendant Liang stated that he wanted to recognize only 1.4% of the hardware-and-services revenue for these four customers as services revenue.[27] By January 2022, when SMCI attempted to recognize the paltry 1.4% of revenue to services, Mr. Luong allegedly refused to approve this improper recognition.[28] Through improperly altering the proportion of revenue that came from hardware versus services, defendants would be able to increase the amount of revenue recognized immediately while decreasing the amount of revenue

---

[23] Securities Compl. ¶ 93.

[24] *Luong* Compl. ¶ 17.

[25] Securities Compl. ¶ 109.

[26] *Id.* ¶ 115.

[27] *Id.* ¶ 116.

[28] *Id.* ¶¶ 118, 119.

recognized over time.[29] He filed internal complaints in March 2022 and was terminated in April 2023 after being placed on leave for six months.

132. The Hindenburg Report corroborated many of Mr. Luong's allegations based on its own investigation and interviews with former employees.

133. For instance, the Hindenburg Report stated that SMCI continued to engage in improper revenue recognition—[redacted]

134. In addition, Hindenburg uncovered evidence of channel stuffing. A former salesperson described to Hindenburg similar aggressive sales practices as alleged in the *Luong* Complaint. The salesperson told Hindenburg that salespeople worked with distributors of SMCI, including Avnet and Tech Data, to over-ship product to boost numbers, in what appeared to be a channel stuffing scheme. According to the same salesperson, this misconduct was the result of Defendant Liang placing "massive pressure" on sales teams each quarter. Hindenburg also spoke to an employee at Genesis Cloud, a current SMCI customer, who said that in June 2023, closing in on SMCI's financial year end, Genesis was shipped "pre-production" servers that were not ready for use:

> We had massive problems with Super Micro, overpromising [and] under-delivering. Shipping pre-production. They were ever so proud to tell us that they were shipping us the first production release of the Gaudi server or Gaudi 2 server. And when it arrived at our data center…. [it was a] pre-production, unit, with basic quality firmware, things like that. We had no end of issues with it.

135. Hindenburg spoke to an employee at another current SMCI customer, Crusoe AI, a GPU cloud provider. That employee told Hindenburg that an order for AI servers comprising 1,000 GPUs was shipped at quarter end, in March 2024, but they "had something like a 40% [GPU] card failure rate." This employee went on to question basic assembly and testing at SMCI:

> We just literally went through, ripped every server open…took every card out, cleaned it off, put it back, and then it worked. And so we're like, hey, guys, did

---

[29] *Id.* ¶ 120. Typically, hardware revenue is recognized nearer to delivery and installation of goods, versus services, which are provided over a period of time, often years.

> you just not test this? Did you not build them properly? Did they get jiggled in transit? Like, what the hell?

### 5. Management Continues to Rehire Previously Terminated Employees, Which Reflects Continued Lack of Internal Controls and Increases the Risk to SMCI's Financial Statements

136. If the increasing internal control deficiencies and export control risks were not enough, [redacted] engaged in rehiring practices that intentionally and/or recklessly exposed the Company to unnecessary risk of revenue recognition misconduct and other improper accounting. [redacted] These individuals included former CFO Hideshima—a chief overseer of the accounting mismanagement—as well as former VP of Finance Peggy Lin [redacted] Given these individuals' history of subjecting the Company to financial risk, it was unjustifiable for the Board and management to rehire these individuals. In what can only be recognition of the impropriety of their actions—or at the very least, gross recklessness—[redacted]

137. [redacted] As discussed *supra* Section IV.B.3, former CFO Hideshima left the Company in January 2018 amidst a wave of dismissals and resignations [redacted] He was also an individual target of one of the SEC Orders, which found that Hideshima "pressed employees" to engage in improper revenue recognition practices, "implemented practices" that caused SMCI to overvalue inventory and understate expenses and engaged in other improper activity that violated the Exchange Act, all of which "caused [SMCI]'s reporting, books and records, and internal accounting control violations."

138. [redacted]

139. [redacted]

140. [redacted]

Hid[redacted]

141. The rehiring of these previously terminated employees constituted a breach of the officers' and the Audit Committee's fiduciary duties to the Company. Not only did Defendant Liang, Defendant Weigand, and the Audit Committee expose the Company to risk by bringing back individuals who had a history of being involved in accounting improprieties[redacted]

142. [redacted]

143. [redacted]

**6.** [redacted]

144. Management's improper rehiring of previously terminated employees—and the lack of systems in place that would enable sufficient Audit Committee oversight—were a symptom of a larger problem at the Company: generating as much revenue as possible, regardless of whether doing so was proper and lawful. Hitting revenue milestones was, in fact, one of the measures for Defendant Liang's ability to achieve certain bonus payments. According to SMCI SEC filings, the 2023 CEO Performance Award granted to Defendant Liang a long-term performance based option award to purchase up to 5 million shares of the Company's common stock. This award may vest in five equal tranches, each tranche of which vests if a specified revenue goal and a specified stock price goal is achieved, and the net revenue goals must be achieved by December 31, 2028. Under the terms of the 2023 CEO Performance Award, Defendant Liang would continue to receive a de minimis salary of $1 per annum and no cash bonuses until the earlier of the date that all five tranches shall have vested or March 31, 2029. Accordingly, reverting to working with personnel who could prematurely recognize revenue was to Defendant Liang's personal advantage, even if they introduced material risks into SMCI's financial reporting. This was precisely the type of environment that Defendant Liang attempted to recreate, despite the Company's history of restatements and the SEC Orders.

145. [redacted]

146. [redacted]

[redacted]

**7. [redacted] Subpoenas [redacted] ble [redacted]**

147. [redacted]

**8. EY Questions Management's Transparency and Advises Audit Committee that Completion of the Audit is at Risk**

148. [redacted] 4, EY informed the Audit Committee that completion of the audit [redacted] was at "significant risk." [redacted]

149. [redacted]

[redacted]

150. [redacted]

151. [redacted]

[redacted]

**9. With Its Year-End Audit at Risk, SMCI Scrambles to Assuage EY's Concerns and Form a Special Committee to Conduct an Internal Investigation**

152. With the year-end audit at risk given the issues flagged by EY, throughout the first half of August 2024, SMCI attempted to plug holes in its internal controls and rushed to tee up the creation of a Special Committee to investigate and address the concerns raised by EY. [redacted]

153. [redacted] The Company announced the election of Giordano to the Board in an August 19, 2024 Form 8-K (signed by Defendant Liang) and press release, but did not mention the Special Committee. [redacted]

[redacted]

> [redacted]

154. [redacted] retaining Cooley as its independent outside counsel. Cooley also eventually retained a forensic accountant, Secretariat Advisors, LLC [redacted]

155. Separately, as the Audit Committee was forming the Special Committee, it also scrambled to respond to issues that EY had flagged as reasons holding up the audit. [redacted]

- [redacted]

[redacted]

[redacted]

- [redacted]

- [redacted]

156. [redacted]

157. [redacted]

158. [redacted]

[redacted]

159. [redacted] Defendant Liang published a letter to SMCI customers and partners indicating that the Company (and by implication the Special Committee) had already determined that the concerns raised by EY about the Company's lack of internal controls, rehiring of individuals who resigned during the SEC investigation and improper revenue recognition would be immaterial, stating, "[i]mportantly, however . . . we don't anticipate any material changes in our fourth quarter or fiscal year 2024 financial results. This is good news."

### D. The Audit Committee's Oversight Failures Lead to More Than a Billion Dollars of Transactions with the Liang Family Entities

160. At the same time that management and the Board—particularly the Audit Committee—were enabling improper accounting, rehiring and export control practices, they were also facilitating the receipt of individual material benefits that were not in the best interest of the Company. Specifically, they were rubber-stamping transactions with Liang Family Entities that would benefit Defendants Liang, S. Liu and Liaw. The Audit Committee's oversight failures stem from [redacted] ("RPT Policy"), problems with the design of the RPT Policy itself and the Audit Committee's failure to follow the RPT Policy.

#### 1. The Board and the Audit Committee Failed to Oversee the Implementation of an Adequate RPT Policy.

161. SMCI's RPT Policy appears on SMCI's website and has remained largely the same since its adoption several years ago, though it was updated on November 3, 2025 and is now even

more favorable to insiders.[30] On March 26, 2019, SMCI's Board adopted the RPT Policy after years and billions of dollars' worth of business between SMCI and the Liang Family Entities. Per the Audit Committee charter, the Audit Committee has the responsibility to "review, approve and oversee transactions between the Company and any 'related party.'" However, the Board adopted an RPT Policy that forecloses any meaningful review or approval of related party transactions in violation of their oversight duties.

162. The process that led to the adoption of the RPT Policy is deficient in several ways. [redacted]

163. [redacted] a majority of the directors who approved the RPT Policy either directly benefitted from related party transactions

[30] The newly revised RPT Policy only made one change: increasing the pre-approval or ratification of related party transactions threshold from $1 million to $10 million.

with SMCI (Liang, S. Liu, Laura Black,[31] and Saria Tseng[32]) or through the RPT Policy were ratifying transactions that they had earlier failed to oversee (i.e. Laura Black, Michael McAndrews and Fred Tsai ).[33] Despite the Board, rather than the Audit Committee, approving the RPT Policy, several provisions of the RPT Policy purport that they were approved by the Audit Committee.

164. Second, the RPT Policy includes a provision that ratified prior transactions between SMCI, Ablecom and Compuware. Transactions with each of those parties were deemed to be pre-approved and would continue to be deemed pre-approved in the future if they "continued" to be conducted (i) on an arm's length basis, (ii) in accordance with the Company's standard sales, pricing and other terms and policies, (iii) in a manner such that such parties do not receive preferential treatment, and (iv) within the current scope of the Company's business relationship with those parties (collectively, the "Pre-Approval Criteria").

165. In addition, in adopting the RPT Policy, the Board improperly accepted management's representations when it pre-approved the transactions with Ablecom and Compuware when it should have instead deferred to the Audit Committee to independently obtain and review evidence to make its own determination that the transactions were fair to SMCI based on the criteria established in the RPT Policy. This pre-approval was voidable because it was not

[31] While serving on the Board, Laura Black was a managing director of Needham & Co, SMCI's underwriter, and beginning in February 2018, she served as a director of Viavi Solutions Inc, a customer of SMCI.

[32] Since 2004 through her tenure at SMCI, Saria Tseng was employed by Monolithic Power Solutions (Monolithic) and in addition to her salary, received stock options and bonuses tied to Monolithic's business performance. Monolithic was disclosed as a related party in 2019, [redacted]

[33] Black, McAndrews and Tsai were members of the Audit Committee prior to 2019 and utterly failed to oversee the misreported related party relationships during the period of 2007 through 2019.

authorized by the Audit Committee, which was the proper corporate body to authorize the pre-approval pursuant to both NASDAQ rule 5630, which requires that approval of related party transactions be made by an independent committee such as the Audit Committee, as well as pursuant to the language of the RPT Policy itself.

166. Not only did the Board follow a flawed process in approving the RPT Policy, but the RPT Policy is problematic because it does not—and has not—permitted the Audit Committee to meet its fiduciary duty, per the below three reasons.

167. First, the RPT Policy limits oversight of transactions with Compuware and Ablecom by including a provision that pre-approves all future transactions with Ablecom and Compuware. By pre-approving transactions with Ablecom and Compuware, the RPT Policy continues to avoid meaningful independent Audit Committee oversight. Those pre-approvals have been routinely accepted for years, with the Audit Committee ignoring certain Pre-Approval Criteria, as described in further detail *infra* Section IV.D.2. Indeed, the Ablecom Manufacturing Agreement is extremely open-ended and vague and does not define the scope of the products or services covered by the agreement. Likewise, the Ablecom Manufacturing Agreement states that pricing would be "individually negotiated," and largely restricts the Company from contracting with other third parties to manufacture products produced by Ablecom. SMCI has not disclosed any similar agreement with Compuware.

168. Moreover, the only oversight the RPT Policy requires for transactions with Ablecom and Compuware is post-hoc, which is insufficient for the Audit Committee to discharge its oversight duties. According to the RPT Policy, the Audit Committee is responsible for confirming the pre-approved transactions with Ablecom and Compuware after the fact under the Pre-Approval Criteria.

169. Second, the RPT Policy provides outsized power to the CFO. According to the review procedures of the RPT Policy, the CFO is "responsible for collecting information regarding transactions, arrangements and relationships between the Company and Related Parties, determining whether a relationship meets the definition of 'Related Party Transaction,' and

preparing information regarding Related Party Transactions for presentation to the [Audit] Committee, except to the extent otherwise determined by the Chair of the Committee."

170. However, as of February 2021, the person responsible for those review procedures is Defendant Weigand, [redacted]

171. Finally, the RPT Policy side steps the Audit Committee by pre-approving transactions as long as they were the result of "competitive bids." The RPT Policy states that "[t]ransactions where the rates or charges involved in the transactions are determined by competitive bids," are "deemed to be approved or ratified….without the need for any further action by the [Audit Committee]." This pre-approval of "competitive bids" opens the door for any transaction to bypass Audit Committee review whenever the CFO, who is solely responsible for making the related party determination, notes that the transaction involved a competitive bid, no matter the nature or potential conflict of the related party transaction. Remarkably, according to the RPT Policy, if two related parties (such as Ablecom and Compuware) bid on the same transaction, this qualifies as "competitive bids," making the transaction automatically approved, bypassing the Audit Committee.

**2. The Audit Committee Ignores the Board's Own RPT Policy on Pre-Approved Transactions, Breaching Their Fiduciary Duty to the Company.**

172. Since 2007, SMCI has annually disclosed the same singular self-renewing Ablecom Manufacturing Agreement. None of SMCI's publicly disclosed information, [redacted] indicate that any other written agreement governs the terms of their manufacturing relationship.[34]

173. The only other written agreement with Ablecom and Compuware that SMCI has publicly disclosed was a 2021 tripartite agreement with Ablecom and Compuware to expand

[34] While the Company has stated that SMCI has "entered into a series of agreements with Ablecom," the only written agreements publicly disclosed by the Company are the Ablecom Manufacturing Agreement and the Tripartite Agreement.

facilities and operations close to the Supermicro Asia Science and Technology Park ("SMCI Park") in Bade, Taiwan, which was cancelled the following year. SMCI Park is managed jointly by SMCI and Ablecom via a separate entity called Supermicro Asia Science and Technology Park, Inc.

174. Under the RPT Policy, management is obligated to report pre-approved transactions, such as those arising under the Ablecom Manufacturing Agreement, to the Audit Committee on a quarterly basis. The Audit Committee, in turn, is required to assess whether those transactions are conducted in accordance with the Pre-Approval Criteria. [redacted]

175. [redacted]

176. [redacted]

177. [redacted]

178. [redacted]

179. [redacted]

180. [redacted]

181. [redacted]

182. [redacted] Likewise, in the Company's annual reports on Form 10-K signed by the members of the Audit Committee, the Company admitted to selling products to Compuware "at a discount from our standard price" and that it "may not negotiate or enforce contractual terms as aggressively with Ablecom or Compuware as we might with an unrelated party, and the commercial terms of our agreements may be less favorable than we might obtain in negotiations with third parties." This information should have also served as a red flag to the Audit Committee that the Compuware transactions were not in accordance with the Company's standard pricing and violated the RPT Policy by favoring the Liang Family Entities. [redacted]

183. [redacted]

184. [redacted] For instance, in October 2023, after Ablecom and Compuware took their positions in Leadtek, management [redacted]

[redacted] failed to disclose Leadtek's status as a related party in its public filings.

**3. The Audit Committee Failed to Adequately Oversee Billions of Dollars of Transactions Between SMCI and Liang-Family Entities**

185. SMCI engages in a large number of transactions with the Liang Family Entities, each of which is affiliated with members of Management and the Board. Transactions with the Liang Family Entities are inherently conflicted due to the interests of Defendants Liang, S. Liu and Liaw in those companies.

186. Given the close relationships between SMCI and each of the Liang Family Entities, transactions with these companies are at a high risk for "tunneling," a form of self-dealing where an individual with certain influence over a company, such as a founder, controlling stockholder or director, transfers assets to private firms, or utilizes private firms to generate profit that benefits these individuals at the expense of minority shareholders.[35] Academic research has concluded that "family firms" are more prone to tunneling than other types of businesses because they tend to have "access to private information and can thus exploit tunneling opportunities more effectively."[36] Tunneling can take the form of (1) cash flow tunneling, where a related party sells products to a company above market price or the company sells products to the related party

---

[35] *See* Angelo M. Solarino & Brian K. Boyd, *Are All Forms of Ownership Prone to Tunneling? A Meta-Analysis*, Corp. Govern. Int. Rev., Aug. 2020, at 2., https://eprints.whiterose.ac.uk/id/eprint/164905/10/corg.12344.pdf.

[36] Simon John et. al, *Tunneling*, Am. Econ. Rev., May 2000, at 24, https://scholar.harvard.edu/files/shleifer/files/tunneling.pdf; Angelo M. Solarino & Brian K. Boyd, *Are All Forms of Ownership Prone to Tunneling? A Meta-Analysis*, Corp. Govern. Int. Rev., Aug. 2020, at 8, https://eprints.whiterose.ac.uk/id/eprint/164905/10/corg.12344.pdf.

below market price; and (2) asset tunneling, where a related company acquires major assets of affiliate firms at a price that departs from market value,[37] among other forms.

187. As alleged *supra* ¶ 40, Defendants Liang, S. Liu, Liaw and their respective families control Ablecom, [redacted] Compared to Defendants Liang's and S. Liu's 13.5% interest in SMCI, [redacted] gives them a direct financial interest in placing the interests of Ablecom ahead of those of SMCI. Compared to Defendant Liaw's approximate 2.6% interest in SMCI, [redacted] gives him a direct financial interest in placing the interests of Ablecom ahead of those of SMCI.

188. As SMCI has disclosed in its SEC filings, Ablecom not only supplies SMCI, but it also purchases chassis components, including power supplies, from SMCI (though SMCI has not disclosed exactly what types of components it sells to Ablecom). Similarly, according to the Company's SEC filings, Compuware purchases "most" of its components from "outside markets," and then sells the power supplies to SMCI, which SMCI then sells to Ablecom to include in server chassis, and then Ablecom sells the power supplies back to SMCI.

189. Defendants Liang, S. Liu and Liaw's personal financial interests in transactions with Ablecom have led to a significant increase in the Company's purchases from Ablecom. For instance, SMCI's Form 10-K states that Ablecom's sales to the SMCI "comprise a majority of Ablecom's net sales." As detailed in the below, since 2018, SMCI's purchases from Ablecom have amounted to approximately $1.60 billion.

| **Year** | **Purchases from Ablecom** |
|---|---|
| 2018 | $152.3 million |
| 2019 | $145.3 million |
| 2020 | $160.1 million |
| 2021 | $130.8 million |
| 2022 | $200.7 million |

---

[37] *See What is 'Tunneling'*, The Econ. Times, https://economictimes.indiatimes.com/definition/tunneling?from=mdr (last visited Sept. 29, 2025).

| Year | Purchases from Ablecom |
|---|---|
| 2023 | $179.9 million |
| 2024 | $285.8 million |
| 2025 | $345.6 million |
| **Total** | $1,600.5 million |

190. As alleged above in paragraph 43, [redacted] Compared to Defendants Liang's and S. Liu's 13.5% interest in SMCI, [redacted] gives them a direct financial interest in placing the interests of Compuware ahead of those of SMCI. Compared to Defendant Liaw's 2.6% interest in SMCI, [redacted] gives him a direct financial interest in placing the interests of Compuware ahead of those of SMCI.

191. Compuware also manufactures motherboards, backplanes and other components used on the Company's circuit boards. For these products, however, SMCI has disclosed in its SEC filings that it sells "most" of the components to Compuware. Compuware then sells those components back to SMCI with a "manufacturing value added" fee and other "miscellaneous material charges and costs" added. The Company does not describe how the "manufacturing value added" fee is determined besides stating that the Company frequently reviews and negotiates this with Compuware.

192. Defendants Liang, S. Liu and Liaw's personal financial interests in transactions with Compuware have led to a significant increase in the Company's transactions with Compuware. For instance, SMCI's FY2025 Form 10-K states that Compuware's sales of SMCI's products to others "comprise a majority of Compuware's net sales." In addition, over 99% of Compuware's exports to the United States go to SMCI. As detailed in the below table, since 2018, SMCI's purchases from and sales to Compuware have grown by over 135%, comprised of $1.511 billion worth of purchases from Compuware and $255.6 million worth of sales to Compuware.

| Year | Purchases from Compuware | Net Sales to Compuware |
|---|---|---|
| 2018 | $119.5 million | $46.9 million |
| 2019 | $139.6 million | $17.7 million |

| | | |
|---|---|---|
| 2020 | $131.8 million | $23.9 million |
| 2021 | $115.2 million | $27.9 million |
| 2022 | $171.8 million | $26.1 million |
| 2023 | $219.0 million | $36.3 million |
| 2024 | $282.3 million | $46.6 million |
| 2025 | $332.2 million | $30.2 million |
| **Total** | $1,511.4 million | $255.6 million |

193. Also, as alleged *supra* Section III.G, Defendants Liang, S. Liu, Liaw and their respective families have substantial holdings in Leadtek, Ablestnet Technology, Ablestnet Computer, ALT, Aeon Technology and Ableplus, all of which engage in business transactions with SMCI.

194. Because more than a billion dollars has changed hands through these round-trip transactions between SMCI and the Liang Family Entities, all while SMCI's internal controls suffered from critical ongoing deficiencies, these transactions were particularly at risk for cash flow tunneling.

195. [redacted]

[redacted]

196. [redacted]

197. [redacted]

198. [redacted]

[redacted]

199. In addition, SMCI is using related parties such as Compuware to engage in improper accounting practices at the Company. Specifically, Mr. Luong alleged in his lawsuit that since March 2021, after the rehiring of Peggy Lin, she—along with Defendant S. Liu and Defendant S. Liu's brother Edward—have actively negotiated with Compuware and Bill (Jianda) Liang in order to "delay vendor payment and adjust other terms of sale while still allowing early recognition of revenue irrespective of delay in vendor payments."[39] Mr. Luong further described how Defendant Liang would delay approval for hundreds of thousands of dollars' worth of payments to Compuware for weeks, typically around the end of quarters, in order to improperly recognize revenue.[40]

200. SMCI's complex transactions with the Liang Family Entities, particularly Ablecom and Compuware, were undertaken with little to no Audit Committee oversight and have led to the improper diversion of assets and cash flows to related parties.

**E. Hindenburg Discloses to the Public Glaring Accounting Red Flags, Evidence of Undisclosed Related Party Transactions and Violations of Sanctions and Export Restrictions at SMCI**

201. [redacted] on August 27, 2024, Hindenburg published a research report titled, *Super Micro: Fresh Evidence of Accounting Manipulation, Sibling Self-Dealing and Sanctions Evasion at this AI High Flyer*. The Hindenburg Report was the culmination of a "3-month

---

[38] [redacted]

[39] *Luong* Compl. ¶ 24.

[40] Securities Compl. ¶ 102.

investigation, which included interviews with former senior employees and industry experts as well as a review of litigation records, international corporate and customs records," and which "found glaring accounting red flags, evidence of undisclosed related party transactions, sanctions and export control failures, and customer issues."

202. Until this time, the public believed that SMCI had addressed its prior issues that resulted in the Company's financial restatements and delisting and the SEC Orders. However, Hindenburg revealed that SMCI was, in reality, a "serial recidivist," describing in detail the continued misconduct undertaken by the Board and management in defiance of their legal obligations under the SEC Orders. As described below, the Hindenburg Report uncovered issues relating to channel stuffing and accounting violations, related party transactions and export control violations, with their investigation corroborating many of the allegations in the *Luong* Complaint.

**1. Channel Stuffing and Accounting Violations**

203. The Hindenburg Report stated that there were "major corporate governance red flags and evidence of continued improper revenue recognition, following similar charges against the company that resulted in its delisting in 2018 and an SEC charge in 2020." These red flags and evidence related to both SMCI's rehiring of key employees who had been involved with the 2017 accounting improprieties, as well as SMCI's continued improper revenue recognition practices, even after the entry of the SEC Orders. The Hindenburg Report stated that according to former employees, SMCI rehired previously terminated individuals because of their "long-standing relationships with CEO Charles Liang, who valued loyalty over all else." One former sales director stated:

> I wouldn't take comfort in that. If people were let go because their practices were questionable, to bring them back would give me less comfort. I don't think the behavior of the company in many ways has changed in the 5 years since I started, and I started shortly after the delisting problem.

204. The Hindenburg Report also laid out many of the improper accounting practices that had continued at the Company since the settlement of the SEC charges, as discussed *supra* ¶¶ 134-35.

205. Further, the Hindenburg Report flagged that CFO Bauer was pushed out of the Company and replaced by Defendant Weigand, who was less committed to transparency.

**2. Related Party Transactions with Entities Disclosed by SMCI as Related Parties**

206. Other "glaring governance red flags" described in the Hindenburg Report included the relationships and transactions with parties that SMCI had disclosed in its public filings as related parties—namely, Ablecom and Compuware. As described in detail *supra* Sections III.G, IV.A.2, these entities are Liang Family Entities, all of which engaged in transactions with SMCI worth billions of dollars. Not only did these transactions enrich Defendant Liang, S. Liu and Liaw and their respective families, but according to Hindenburg, these "related party dealings, mainly with supplier companies operated by the younger brothers of Super Micro's CEO," could "be used to distort financial metrics like gross margins and profitability."

**3. Liquid Cooling Technologies**

207. In describing the improper relationship between SMCI and the Liang Family Entities, the Hindenburg Report also raised concerns about SMCI allegedly sharing its liquid cooling technology with Ablecom.

208. In 2020, SMCI began touting its liquid cooling technologies—used to prevent AI servers from overheating—and filed and obtained patents in the United States, Taiwan and China.[41] Since then, SMCI has emphasized that its liquid cooling technology provides a long-term competitive advantage. This was echoed by analysts such as JP Morgan and Needham & Co.

209. Despite SMCI's so-called "competitive edge" that arose from its development of liquid cooling technology and its claim to investors in SEC filings that it "retain[s] full ownership of any intellectual property resulting from the design" of liquid cooling technology, the

---

[41] For example: U.S. Patent Nos. 20240314976-A1, 12185497-B2, 20240147673-A1, 20240381585-A1, 20240147665-A1; Taiwan Patent Nos. TW112118536A; TWM667922U; TWM670768U.

Hindenburg Report noted that SMCI may have shared its liquid cooling technology with Ablecom.

210. Just a year after SMCI began touting its liquid cooling technologies, Bill (Jianda) Liang and Steve (Jianfa) Liang began filing patents, on behalf of Ablecom, relating to liquid cooling technologies (five in Taiwan[42] and two in the United States).[43] According to Hindenburg, Ablecom now allegedly manufactures thermal cooling solutions for servers and has debuted liquid cooling systems at trade shows. Indeed, Hindenburg stated that SMCI has showcased Ablecom's liquid cooling systems at a key industry conference.

**4. Undisclosed Related Party Transactions**

211. The Hindenburg Report also revealed that SMCI engaged in suspected undisclosed related party transactions with other Liang Family Entities, namely, ALT, Aeon Biotech, Ablestnet Technology, Ablestnet Computer and Leadtek. SMCI's relationship with these entities is discussed *supra* Section III.G.

212. For instance, the Hindenburg Report claimed that ALT and Aeon Biotech were both "undisclosed suppliers of Super Micro." Further, according to Hindenburg, "not only is [ALT] in the server business, like Super Micro, Compuware and Ablecom, it also operates from the same location." Likewise, Aeon Biotech is "located within the 'Supermicro AI Technology Park.'"

213. Hindenburg took particular issue with Leadtek, which at the time, SMCI had not yet disclosed as a related party. However, as the Hindenburg Report explained, "[g]iven the circular nature of their relationship, the indirect ownership by Charles Liang and the close ties to Super Micro, this appears to be a de facto, undisclosed related party."

---

[42] Taiwan Patent Nos. TWM668264U, TWMM63001U, TW202350058A, TWI790889B and TWM627038U.

[43] *See* U.S. Patent Nos. 20240057285-A1 "Plug-in pump installation structure of a cooling distribution unit,"; 20230324124-A1, "Series connected water cooling structure."

214. Finally, the Hindenburg Report also disclosed an "odd relationship with a key customer," tech startup Lambda Labs ("Lambda"). Specifically, in February 2024, SMCI made an undisclosed investment in Lambda as part of its $320 million funding round. And in August of that same year, SMCI reportedly signed an "'unusual' $600 million contract to lease space at a California data center and sub-lease it to Lambda." According to Hindenburg, "[w]e think Super Micro should disclose any investment in Lambda and the details of any revenue arrangements between the two." This is particularly true as "Lambda seems to have purchased hardware and datacenter space through Super Micro, without disclosure of the potential related party nature of the deal owing to a Super Micro investment."

**5. Evading Sanctions and Export Restrictions on Russia**

215. In addition to the accounting and related party issues, the Hindenburg Report also revealed that SMCI was allegedly evading United States export restrictions following Russia's invasion of Ukraine.

216. As background context, the Hindenburg Report noted SMCI's 2006 felony plea for export control violations. The Hindenburg Report then concluded that SMCI "may once again be evading U.S. export restrictions," stating that Hindenburg did "not believe that [SMCI] adequately performed its own internal screening procedures, let alone others required by U.S. government agencies."

217. Since Russia invaded Ukraine on February 24, 2022, SMCI's exports to Russia spiked more than three times, suggesting that the Company had violated trade restrictions. The Hindenburg Report further stated that in 2023, SMCI's exports to Russia "rose to $126.6 million – 9.6x higher than in 2021 – per Tradesparq data." The Hindenburg explained that "[t]hat value was equivalent to 4.9% of Super Micro's total worldwide sales, excluding the U.S., in calendar 2023, per filings."

218. Specifically, the Hindenburg Report disclosed that SMCI appeared to have "knowingly suppl[ied] one of its longstanding Russian customers," importer Niagara Computers, a supplier to one of Russia's largest "supercomputers." According to "trade data," SMCI exported goods "directly to Niagara until February 24th, 2022, the day Russia invaded Ukraine." Then,

"per import-export data," SMCI sold its goods through a California distributor named Business Development International between July 12, 2022 and February 8, 2023, "in apparent contravention of U.S. trade restrictions." In "a little more than 6 months," Business Development International shipped more than $5.8 million in of "'computing machine devices,' 'data processing blocks' and 'parts and accessories' solely to Niagara Computers in Russia, per Tradesparq."

219. Though Business Development International wound down its export operations, the Hindenburg Report explained that "three recently-created Turkish companies took over shipping Super Micro products to Niagara." The first was Koc Gemicilik Ve Tasimacilik, which, per Tradesparq, exported $32.1 million of Super Micro products solely to Niagara in Russia between March 6, 2023 and December 21, 2023. According to Hindenburg, in June 2024, Koc Gemicilik Ve Tasimacilik "was placed under U.S. sanctions for its role in smuggling restricted items to Russia." The other two Turkish export intermediaries were Alfament Yazilim Teknoloji and AMD Ithalat Ihracat, which formed within two months of the Russian invasion of Ukraine, per the Turkish corporate gazette. According to Hindenburg, those two entities shipped a combined $8.3 million of SMCI components to Niagara between January 2023 and October 2023. Those products appeared to be coded for military use. Hindenburg criticized SMCI's dealings with the Turkish entities, stating:

> Newly-created Turkish entities, run by Ukrainian and Russian citizens, with little or no trading history and little or no online presence would have been an unmissable warning sign during even the most rudimentary due diligence and export compliance.

220. In addition, the Hindenburg Report disclosed that one of SMCI's "authorized partners," Beiliande, had exported more than $10.25 million of SMCI components to Russia between November 2, 2022 and November 14, 2023 via its Shenzhen and Hong Kong operations, per Tradesparq. Beiliande's largest customer was St. Petersburg-based Asilan, which received about $3.6 million-worth in goods, and which stated on its website that it was a partner of SMCI.

221. The Hindenburg Report further stated that almost $30 million of SMCI components were shipped to Moscow-based IT distributor Vneshekostil via a Hong Kong entity

created seven weeks after the war began. According to Hindenburg, Vneshekostil was sanctioned by the U.S. in September 2023 after it became "'one of the largest importers of dual-use chips into Russia,'" per the U.S. Treasury.

222. Finally, the Hindenburg Report disclosed that SMCI had entered into a joint venture partnership with Chinese state-owned technology company Fiberhome Telecommunications Technologies. Fiberhome had been placed on a U.S. Bureau of Industry and Security list to restrict Fiberhome's access to U.S. technology in 2020 because of its involvement in alleged "'human rights violations and abuses.'" However, from July 1, 2020 through June 31, 2023, SMCI shipped $196.4 million of high-tech components to the joint venture. SMCI reportedly believes it is in compliance with U.S. government controls because the joint venture entity itself is not watchlisted. [redacted]

### F. Fallout from the Hindenburg Report at SMCI

#### 1. Regulatory [redacted] Scrutiny of Internal Controls Increase and SMCI Delays FY2024 Form 10-K Filing

223. The Hindenburg Report resulted in regulatory and heightened internal scrutiny of SMCI's internal controls.

224. On the external side, for instance, on September 26, 2024, the Wall Street Journal reported that DOJ had opened an investigation into SMCI. [redacted]. SMCI disclosed to the public on February 11, 2025 that the Company had received subpoenas from the DOJ and SEC in late 2024 seeking documents.

225. [redacted] On the one hand, the Hindenburg Report reflected many of the issues that [redacted]

[redacted] But the Hindenburg Report also raised new details on these issues as well as new issues all together, [redacted]

226. [redacted]

227. On August 28, 2024, SMCI filed a Form 8-K and press release announcing that it expected to file a Notification of Late Filing on Form 12b-25 on August 30, 2024 with respect to its annual report on Form 10-K for the fiscal year ended June 30, 2024, with the press release explaining that management required more time "to complete its assessment of the design and operating effectiveness of its internal controls over financial reporting." The Form 12b-25 filed on August 30, 2024 disclosed that the Board had "formed a committee to review certain of the Company's internal controls and other matters."

228. On September 17, 2024, NASDAQ sent SMCI a letter requesting a plan for regaining compliance with Listing Rule 5250(c)(1). The Company filed a Form 8-K on September 20, 2024 (which was signed by Defendant Liang) and issued a press release announcing the same. The press release explained that under the Nasdaq rules, SMCI would have 60 days from the date of the notice either to file the Form 10-K or to submit a plan to Nasdaq to regain compliance with Nasdaq's listing rules. If SMCI submitted a plan and it is accepted, then it could be granted up to 180 days from the Form 10-K's due date to regain compliance. The press release and Form 8-K

did not comment on the Company's likelihood of being able to file within the extension period, [redacted]

**2. EY Resigns After Receiving the Special Committee's Interim Report [redacted]**

229. [redacted]

[redacted]

[redacted]

230. [redacted]

[redacted]

231. [redacted]

[redacted]

[redacted]

[redacted]

232. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

233. [redacted]

[redacted]

[redacted]

[redacted]

234. [redacted]

[redacted]

[redacted]

235. [redacted]

[redacted]

236. [redacted]

237. [redacted]

[redacted]

238. On October 30, 2024 SMCI filed a Form 8-K announcing that EY had sent the Audit Committee its letter of resignation on October 24, 2024 ("October 2024 Form 8-K"). The October 2024 Form 8-K, which was signed by Defendant Liang, then disclosed to the public the nature of EY's concerns and the formation of the Special Committee to review the matters raised by EY and certain of the Company's internal controls:

> In late July 2024, EY communicated to the Audit Committee concerns about several matters relating to governance, transparency and completeness of communications to EY, and other matters pertaining to the Company's internal control over financial reporting, and that the timely filing of the Company's annual report was at significant risk. In response, the Board appointed an independent special committee of the Board (the "Special Committee") to review the matters and certain of the Company's internal controls and certain governance procedures (the "Review"). The Special Committee engaged Cooley LLP, and forensic accounting firm Secretariat Advisors, LLC to perform an investigation on behalf of and at the direction of the Special Committee. EY and the Board received updates with preliminary information relating to the Review. As of the date of this Current Report on Form 8-K, the Review remains ongoing and final findings and recommendations have not yet been communicated to EY or the Board.
>
> After receiving additional information through the Review process, EY informed the Special Committee that the additional information EY received raised questions, including about whether the Company demonstrates a commitment to integrity and ethical values consistent with Principle 1 of the COSO Framework, about the ability and willingness of the Audit Committee and overall Board to demonstrate and act as an oversight body that is independent of the CEO and other members of management in accordance with Principle 2 of the COSO Framework, and whether EY could rely on representations from certain members of management and from the Audit Committee. In the Resignation Letter, EY stated, in part: "we are resigning due to information that has recently come to our attention which has led us to no longer be able to rely on management's and the Audit Committee's representations and to be unwilling to be associated with the financial statements prepared by management, and after concluding we can no longer

provide the Audit Services in accordance with applicable law or professional obligations."

239. The October 2024 Form 8-K remarked that SMCI disagreed with EY's decision to resign and that the Special Committee's investigation was still ongoing.

240. [redacted]

241. [redacted]

[redacted] Under the RPT Policy, Audit Committee approval was generally required for initiating related party transactions.

242. [redacted]

243. [redacted]

### 3. SMCI's New Auditor Identifies Continued Internal Control Issues Despite Final Report of Special Committee, but Signs Off on Company's Delayed Annual Report

244. On November 18, 2024, SMCI announced in a Form 8-K (signed by Defendant Liang) and a Company press release that the Audit Committee appointed BDO USA, P.C. ("BDO") as SMCI's new independent auditor to replace EY. SMCI also disclosed that it had

submitted a compliance plan to Nasdaq to support its request for an extension of time to regain compliance with the Nasdaq continued listing requirements.

245. [redacted]

*246.* [redacted]

247. [redacted]

[redacted]

248. [redacted]

249. [redacted]

250. [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

251. [redacted]

252. Several days later, on December 2, SMCI issued a press release titled, "Supermicro Announces Completion of Review by Independent Special Committee," touting that the Special Committee purportedly found "no evidence of misconduct." In addition to summarizing the Final Report, the press release emphasized to the public that the Board had "approve[d] the transition to a new CFO."

253. [redacted]

254. [redacted]

255. [redacted]

256. [redacted]

257. [redacted]

[redacted]

258. [redacted]

259. [redacted]

[redacted]

260. [redacted]

261. [redacted]

262. [redacted]

[redacted]

263. [redacted]

264. [redacted]

265. [redacted]

[redacted]

266. [redacted]

267. [redacted]

268. [redacted] reflect the failure of management and of the Audit Committee and the Board more generally to undertake necessary steps to improve the Company's internal controls following the SEC Orders that had been lodged almost five years ago.

269. [redacted]

[redacted]

270. On February 25, 2025, the Company filed its FY2024 Form 10-K for the fiscal year ended June 30, 2024, which was signed by Defendants Liang, Weigand, S. Liu, Fairfax, Lin, Blair, Tuan, T. Liu and Liaw. Under the Risk Factors section, the FY2024 Form 10-K noted that the Company had "identified material weaknesses in [its] internal control over financial reporting," stating:

> We have concluded that our internal control over financial reporting was not effective as of June 30, 2024 due to the existence of material weaknesses in such controls, and we have also concluded that our disclosure controls and procedures were not effective as of June 30, 2024 due to material weaknesses in our internal control over financial reporting, all as described in Part II, Item 9A, "Controls and Procedures" of this Annual Report. While we have initiated remediation measures to address the identified material weaknesses, we cannot provide assurance that our remediation efforts will be adequate to allow us to conclude that such controls will be effective in the future. We also cannot assure you that additional material weaknesses in our internal control over financial reporting will not arise or be identified in the future. We intend to continue our control remediation activities and to continue to improve our overall control environment and our operational, information technology, financial systems, and infrastructure procedures and controls, as well as to continue to train and develop our personnel who are essential to effective internal controls.

271. Similarly, the Management's Evaluation of Disclosure Controls and Procedures section stated that Defendant Liang and Defendant Weigand "concluded that our disclosure controls and procedures were not effective at the reasonable assurance level as of June 30, 2024 due to the material weaknesses in our internal control over financial reporting described below."

272. Management's Report on Internal Control over Financial Reporting elaborated on the material weaknesses identified relating to ITGC, segregation of duties, manual journal entries, completeness and accuracy of IPE and control activities:

> [M]anagement identified certain material weaknesses in our internal control over financial reporting. A material weakness is a deficiency, or a combination of deficiencies in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim consolidated financial statements will not be prevented or detected on a timely basis. The identified material weaknesses pertain to: (i) information technology general controls for certain IT systems that support the Company's financial reporting process were not appropriately identified, designed or implemented; (ii) controls to address segregation of duties conflicts were not properly designed and appropriately implemented; (iii) controls and documentation thereof, over the

> review and approval of manual journal entries were not properly designed and appropriately implemented to prevent unauthorized access to post journal entries; (iv) controls over the completeness and accuracy of information produced by the entity impacting multiple financial statement areas were not properly documented; and (v) management did not design, implement and retain appropriate documentation of control procedures to achieve timely, complete and accurate recording and disclosures across multiple financial statement areas including the timely identification and disclosure of new leasing arrangements and new related party transactions.
>
> The above material weaknesses could have increased the risk of unauthorized access to certain information technology systems that support our financial reporting processes, manipulation of data that we use to produce our financial statements, and/or lack of complete and accurate information, which could lead to financial misstatements and affect our ability to report our information on a timely basis.
>
> ***We have concluded that our internal control over financial reporting was not effective as of June 30, 2024 due to the existence of material weaknesses in such controls as described above. As of the date hereof, we have not remediated any of those material weaknesses.***

273. In short, due to these material deficiencies in internal controls, investors could not rely on the accuracy of the Company's financial statements. Or, as Jack Castonguay, associate professor of accounting at Hofstra University in New York explained, as quoted in a February 2025 *CFO Dive* article about SMCI, "[w]hat an adverse opinion on internals means at its most simplest is there's a high risk that a material misstatement would not be prevented or detected."

**G. The Board and Audit Committee's Misconduct Has Caused Significant Injury to the Company**

274. As a result of Defendants' breaches of fiduciary duty, the Company has incurred massive losses and immense and likely irreparable reputational harm, which is reflected in a staggering loss of market capitalization. It also now faces massive liability in connection with myriad legal and regulatory actions against the Company.

275. Defendants' failure to address the Company's known internal control problems as well as their approval of efforts that undermined the Company's so-called remediation steps following the SEC Orders all directly led to the resignation of EY, material weaknesses in the Company's internal controls and financial reporting, delays in the Company's SEC filings, and risks to their credit facility and potential delisting.

276. Reflecting the massive harm done to SMCI and the Company's loss of credibility in the marketplace, SMCI has lost hundreds of millions of dollars of market capitalization—with its closing market price falling 21.16% from $56.251 per share on August 26, 2024 to $44.349[44] per share two days later—and exposed the Company to liability to investors for securities fraud in *In re Super Micro Computer, Inc. Securities Litigation*, Docket No. 5:24-cv-06147.

277. Moreover, the allegations in the Hindenburg Report have led to investigations by the Department of Justice and SEC into a variety of the Company's practices, [redacted] These investigations are likely to result in significant injury to the Company in the form of legal expenses, fines and penalties. In addition, Defendants actions have resulted in massive costs related to multiple internal investigations, retention of experts and consultants and the hiring of multiple independent auditors to address the Company's financial reporting issues. For example, the Company expended at least $74 million over the course of FY2024 that was attributable to the Special Committee investigation and the delay in filing the FY2024 Form 10-K.

278. Meanwhile, while the Company suffered, the Defendants profited. Defendants Liang, S. Liu and Liaw benefitted from more than a billion dollars' worth of related party transactions with the Liang Family Entities that were never meaningfully reviewed or approved by the Board or Audit Committee, presumably with unfair terms. Likewise, the Company tunneled valuable assets to Ablecom and Compuware. The Company's widespread internal control failures make that injury to the Company impossible to quantify without discovery from the Company.

---

[44] Unless otherwise noted, the SMCI stock prices discussed herein are adjusted for the ten-for-one forward split of SMCI common stock (the "Stock Split"), par value $0.001 per share, that the Company announced in a Form 8-K filed on September 26, 2024. The Stock Split became effective on September 30, 2024.

279. In addition, Company insiders have profited massively from sales of SMCI stock while in possession of the Company's material non-public information in an amount totaling approximately $98 million in sales, as detailed *supra* ¶ 10.

**H. The Special Committee's Final Report Suffered from Multiple Infirmities**

280. [redacted]

**1.** [redacted]

281. [redacted]

**2.** [redacted]

282. [redacted]

[redacted] Defendant Weigand remains SMCI's CFO.

283. [redacted]

284. [redacted]

[redacted]

285. [redacted] It was not until February 25, 2025, that the Company first publicly identified Leadtek as a related party in its 2024 Annual Report.

286. [redacted]

287. [redacted]

[redacted]

288. [redacted]

289. [redacted]

290. [redacted]

291. [redacted]

[redacted]

292. [redacted] summarized to the public in December 2024, and because a new auditor, BDO, was in place. [redacted]

**V. Insider Trading Allegations**

293. During the Relevant Period, Defendants Liang, S. Liu, Blair, Clegg, Fairfax, Kao, T. Liu, Tuan and Weigand (the "Selling Defendants") sold SMCI common stock while in possession of material non-public information.

294. The Selling Defendants knew of and misappropriated for their personal benefit SMCI's material non-public information which the Company had failed to disclose to investors, including among other things:

- The rehiring of employees who had resigned or were terminated for their involvement in the 2017 accounting misconduct;
- The Company's ongoing material internal control weaknesses over its financial reporting;
- The Company's ongoing failure to comply with the SMCI SEC Order and securities regulations;
- Management's efforts to improperly recognize revenue;
- The lack of transparency between the Board and management and EY, and EY's inability to rely on the Board's and management's representations in connection with the Company's financial statements;
- The extent of SMCI's intertwined financial relationship with related parties Ablecom and Compuware;
- The years-long failure of the Board and Audit Committee's oversight of internal controls and financial accounting;
- All related parties and the questionable related party transactions with entities connected to Defendant Liang's family; and
- The evasion of US export restrictions.

295. The Selling Defendants had a duty to disclose such information before selling or to abstain from selling shares.

296. The Selling Defendants sold substantial amounts of SMCI stock because each of them was motivated, in whole or in part, by the substance of such information. Such sales occurred at artificially inflated prices resulting from the Company's failure to disclose the material non-public information described herein.

297. Defendants Liang and his wife S. Liu[45] sold a total of 641,115 SMCI shares for a total of over $53 million during the Relevant Period, as indicated in the table below.[46]

---

[45] Because Defendants Liang and S. Liu are married, they are indirect owners of each other's SMCI stock. Accordingly, each of their Forms 4 filed with the SEC reports sales made by the other.

[46] The figures contained in the insider trading tables in this Section reflect the Defendants' Form 4 disclosures, which are unadjusted for the September 2024 Stock Split.

| Date | # of Shares Disposed | Average Weighted Price | Total Proceeds |
|---|---|---|---|
| 2021-04-01 | 61,511 | $ 39.2572 | $ 2,414,749.63 |
| 2021-04-05 | 60,126 | $ 40.0235 | $ 2,406,452.96 |
| 2021-04-06 | 7,972 | $ 39.5943 | $ 315,645.76 |
| 2021-04-07 | 5,774 | $ 39.3445 | $ 227,175.14 |
| 2021-04-12 | 10,026 | $ 40.1804 | $ 402,848.69 |
| 2021-04-13 | 100 | $ 40.0500 | $ 4,005.00 |
| 2021-04-19 | 41,000 | $ 38.5157 | $ 1,579,143.70 |
| 2021-04-20 | 41,000 | $ 37.8231 | $ 1,550,747.10 |
| 2021-11-03 | 54,491 | $ 41.8518 | $ 2,280,545.34 |
| 2022-01-19 | 29,000 | $ 43.2892 | $ 1,255,385.71 |
| 2022-03-30 | 39,612 | $ 41.1657 | $ 1,630,657.32 |
| 2022-04-19 | 5,388 | $ 42.0000 | $ 226,296.00 |
| 2022-11-02 | 44,000 | $ 75.0000 | $ 3,300,000.00 |
| 2023-01-17 | 50,000 | $ 82.4911 | $ 4,124,552.75 |
| 2023-01-18 | 50,000 | $ 81.8247 | $ 4,091,236.94 |
| 2023-01-19 | 43,772 | $ 71.2626 | $ 3,119,307.25 |
| 2023-06-01 | 43,932 | $ 227.5614 | $ 9,997,228.01 |
| 2023-07-27 | 963 | $ 329.0547 | $ 316,879.68 |
| 2023-10-27 | 961 | $ 243.6185 | $ 234,117.38 |
| 2023-12-05 | 50,000 | $ 252.1750 | $ 12,608,750.00 |
| 2024-01-29 | 962 | $ 476.1000 | $ 458,008.20 |
| 2024-04-29 | 525 | $ 869.4752 | $ 456,474.51 |
| **Total:** | 641,115 | | $ 53,000,207.06 |

298. During the Relevant Period, Defendant Clegg sold a total of 53,041 SMCI shares for a total of over $29 million, as indicated in the table below.

| Date | # of Shares Disposed | Average Weighted Price | Total Proceeds |
|---|---|---|---|
| 2022-05-25 | 6,800 | $ 48.4716 | $ 329,606.88 |
| 2022-11-23 | 1,000 | $ 91.0313 | $ 91,031.30 |
| 2023-05-30 | 16,514 | $ 232.2758 | $ 3,835,803.01 |
| 2024-02-14 | 28,727 | $ 874.5723 | $ 25,123,837.68 |
| **Total:** | 53,041 | | $29,380,278.87 |

299. During the Relevant Period, Defendant Kao sold a total of 17,920 SMCI shares for a total of over $6.4 million, as indicated in the table below.

| Date | # of Shares Disposed | Average Weighted Price | Total Proceeds |
|---|---|---|---|
| 2023-02-03 | 2,000 | $ 85.0400 | $ 170,080.00 |
| 2023-05-11 | 553 | $ 135.1850 | $ 74,757.31 |
| 2023-08-14 | 5,160 | $ 269.9868 | $ 1,393,131.89 |
| 2023-08-31 | 2,968 | $ 280.7936 | $ 833,395.40 |
| 2023-11-09 | 3,747 | $ 275.7554 | $ 1,033,255.48 |
| 2024-02-05 | 1,608 | $ 649.8500 | $ 1,044,958.80 |
| 2024-02-15 | 1,884 | $ 993.0000 | $ 1,870,812.00 |
| **Total:** | 17,920 | | $ 6,420,390.88 |

300. During the Relevant Period, Defendant Weigand sold a total of 57,622 SMCI shares for a total of over $14 million, as indicated in the table below.

| Date | # of Shares Disposed | Average Weighted Price | Total Proceeds |
|---|---|---|---|
| 2023-11-06 | 16,072 | $ 249.5962 | $ 4,011,510.86 |
| 2023-12-01 | 21,550 | $ 267.8753 | $ 5,772,711.76 |
| 2023-12-05 | 20,000 | $ 252.1750 | $ 5,043,500.00 |
| **Total:** | 57,622 | | $ 14,827,722.62 |

301. During the Relevant Period, Defendant Fairfax sold a total of 9,926 SMCI shares for a total of over $1.6 million, as indicated in the table below.

| Date | # of Shares Disposed | Average Weighted Price | Total Proceeds |
|---|---|---|---|
| 2021-05-13 | 4,428 | $ 34.0254 | $ 150,664.47 |
| 2021-07-02 | 3,398 | $ 35.2185 | $ 119,672.46 |
| 2023-12-01 | 300 | $ 262.4900 | $ 78,747.00 |
| 2024-01-02 | 300 | $ 280.0000 | $ 84,000.00 |
| 2024-02-01 | 300 | $ 540.0000 | $ 162,000.00 |
| 2024-03-01 | 300 | $ 881.8800 | $ 264,564.00 |
| 2024-04-01 | 300 | $ 1,010.0000 | $ 303,000.00 |
| 2024-05-01 | 300 | $ 777.3600 | $ 233,208.00 |
| 2024-06-03 | 300 | $ 802.0000 | $ 240,600.00 |
| **Total:** | 9,926 | | $ 1,636,455.93 |

302. During the Relevant Period, Defendant T. Liu sold a total of 5,500 SMCI shares for a total of over $835,000, as indicated in the table below.

| Date | # of Shares Disposed | Average Weighted Price | Total Proceeds |
|---|---|---|---|
| 2023-02-06 | 5,000 | $ 83.2718 | $ 416,359.00 |
| 2024-05-30 | 500 | $ 839.1712 | $ 419,585.60 |
| **Total:** | 5,500 | | $ 835,944.60 |

303. During the Relevant period, Defendant Tuan sold a total of 42,697 SMCI shares for a total of over $6.6 million, as indicated in the table below.

| Date | # of Shares Disposed | Average Weighted Price | Total Proceeds |
|---|---|---|---|
| 2021-08-30 | 5,000 | $ 35.4291 | $ 177,145.50 |
| 2021-11-05 | 2,697 | $ 46.2593 | $ 124,761.33 |
| 2022-02-09 | 396 | $ 39.0000 | $ 15,444.00 |
| 2022-02-10 | 9,604 | $ 39.0000 | $ 374,556.00 |
| 2022-05-13 | 10,000 | $ 51.9514 | $ 519,514.00 |
| 2022-08-31 | 2,500 | $ 65.2096 | $ 163,024.00 |
| 2022-11-07 | 4,579 | $ 77.4827 | $ 354,793.28 |
| 2022-11-08 | 421 | $ 78.0093 | $ 32,841.92 |
| 2023-02-08 | 1,000 | $ 87.0000 | $ 87,000.00 |
| 2023-08-30 | 1,000 | $ 272.0000 | $ 272,000.00 |
| 2023-12-05 | 500 | $ 252.1750 | $ 126,087.50 |
| 2024-02-29 | 5,000 | $ 873.9767 | $ 4,369,883.54 |
| **Total:** | 42,697 | | $ 6,617,051.07 |

304. During the Relevant Period, Defendant Blair sold a total of 800 SMCI shares for a total of $201,740, as indicated in the table below.

| Date | # of Shares Disposed | Average Weighted Price | Total Proceeds |
|---|---|---|---|
| 2023-12-05 | 800 | $252.1750 | $201,740.00 |

305. The market price that the Selling Defendants received for selling their SMCI stock is higher than what it would have been had the adverse information that served as the basis for their sales been public. In fact, SMCI's stock price declined from a closing market price of $56.251 per share on August 26, 2024 to $44.349 per share on August 28, 2024, a decline of about 21.16% in the span of only two days after the publication of the Hindenburg Report. On

November 15, 2024, two days after the Company reported that it would be unable to timely file its Form 10-Q for Q1 of FY2025 and its FY2024 Form 10-K, SMCI's stock price dropped as low as $17.25 per share.

## VI. Derivative and Demand Futility Allegations

306. Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though they were fully set forth herein.

307. Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress breaches of fiduciary duty by fiduciaries of SMCI and to recover Company assets and cashflow improperly tunneled to the Liang Family Entities.

308. SMCI is named as a nominal defendant solely in a derivative capacity.

309. Plaintiffs are stockholders of SMCI, were stockholders of SMCI at the time of the wrongdoing alleged herein, and have been stockholders of SMCI continuously since that time.

310. Plaintiffs will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting the Company's rights.

311. Plaintiffs have retained counsel experienced in prosecuting this type of derivative action.

312. Plaintiffs did not make any demand on the Board to institute and prosecute this action because the Board is incapable of making an independent and disinterested decision, and demand would have thus been futile.

313. As a result of the facts set forth herein, Plaintiffs did not make a demand on the Board to institute this action against the Individual Defendants. Pre-suit demand would be futile here—and is therefore excused—because there exists a reasonable doubt that at least half of the Board at the time of the filing of this Complaint (the "Demand Board") could properly exercise independent and disinterested business judgment in responding to such a demand.

314. The current Demand Board has nine members: Defendants Liang, S. Liu, Liaw, T. Liu, Blair, Lin and Tuan ("Demand Defendants"), as well as Giordano and Angel. Demand is therefore futile if at least five of the nine directors either lack independence, are not disinterested,

or both. Here, three management directors presumptively lack independence and at least four other directors lack independence, are not disinterested, or both.

315. This lack of independence of the Demand Board stems in part from the domination and control that Defendant Liang maintains over the Company. As CEO and Chairman of the Board, Liang has insulated the Board with a web of long-time associates loyal to him. Despite the Company's duty to public stockholders, Defendants Liang, S. Liu and Liaw run SMCI as a family business using family-owned entities to engage in significant related-party transactions. In addition, numerous Liang family members work for and hold equity in the Company. According to SMCI's April 24, 2025 proxy statement, they include Hung-Fan (Albert) Liu (S. Liu's brother), who works in SMCI's operations organization in San Jose; Shao Fen (Carly) Kao (sister-in-law of S. Liu) who works in SMCI's information systems organization in San Jose; Mien-Hsia (Michelle) Hung (sister-in-law of S. Liu), who works in SMCI's marketing organization in Taiwan; and Bill Liang (son of Liang and S. Liu, and nephew of Compuware CEO Bill (Jianda) Liang), who works in SMCI's systems engineering organization in San Jose. Liang's dominance and cultish following within the Company means that he controls the Company, despite holding just 13.5% of its shares. As admitted by the Company in its 10-K, Liang is a "significant stockholder" and has "considerable influence over the management" of SMCI's business relationships.

316. The Demand Defendants' substantial likelihood of liability is based primarily on three *Caremark* claims: a Red Flags claim, an Information Systems claim and a Massey Claim. In breaching their fiduciary duties under *Caremark*, the Demand Defendants ignored red flags, failed to implement adequate internal controls and permitted SMCI to operate in violation of the SEC Order, federal securities laws and export control laws. The Demand Defendants' actions resulted in material weaknesses in the Company's internal controls rendering its financial statements unreliable, discussed in detail above. In addition, a majority of the Demand Defendants sold SMCI stock while in possession of material non-public information.

317. The Demand Defendants' misconduct is characterized by at least one of the following factors, rendering demand upon them futile: (a) receipt of material personal benefits

stemming from the underlying alleged misconduct; (b) a substantial likelihood of liability for conduct as Board members for violating *Caremark*; and (c) a lack of independence from the highly-dominant CEO and Chairman of the Board, Defendant Liang, and his key allies also on the Board. Each of these infirmities is independently sufficient to disable a director from properly exercising independent and disinterested business judgment in responding to a demand.

318. The chart below depicts the respective Demand Defendants' roles, tenures and reasons why they are unable to consider a demand in good faith:

| **Director** | **Duration** | **Other Roles** | **Reason unable to consider a demand** |
|---|---|---|---|
| Charles Liang | 1993–Present | Co-Founder (1993–Present); CEO (1993–Present); President (1993–Present); Chairman of the Board (1993–Present) | • Officer of the Company;<br>• Faces a substantial likelihood of personal liability for disregarding red flags relating to: related party transactions, material weaknesses in internal controls, accounting improprieties, rehiring of employees involved in accounting improprieties, export control violations, insider trading and related issues;<br>• Faces a substantial likelihood of personal liability for failing to implement adequate information systems;<br>• Faces a substantial likelihood of personal liability for permitting SMCI to violate legal obligations relating to the SEC Orders and export control laws;<br>• Personal beneficiary of related party transactions and insider trading. |
| Chiu-Chu (Sara) Liu | 1993–Present | Co-Founder (1993–Present); Director (1993–Present); Treasurer (1993–May 2019); | • Officer of the Company;<br>• Lacks independence from Liang; |

| **Director** | **Duration** | **Other Roles** | **Reason unable to consider a demand** |
|---|---|---|---|
| *Wife of Charles Liang* | | SVP, Operations (May 2014–Feb. 2018);<br>Chief Administrative Officer (Oct. 1993–May 2019) | • Faces a substantial likelihood of personal liability for disregarding red flags, failing to implement adequate information systems and permitting SMCI to violate legal obligations for the same reasons as Liang;<br>• Personal beneficiary of related party transactions, rehiring and insider trading. |
| Yih-Shyan (Wally) Liaw | 1993–2018; 2023–Present | Co-Founder (1993–Present);<br>Director (1993–2018; 2023–Present) | • Officer of the Company;<br>• Lacks independence from Liang;<br>• Faces a substantial likelihood of personal liability for disregarding red flags, failing to implement adequate information systems and permitting SMCI to violate legal obligations for the same reasons as Liang;<br>• Personal beneficiary of related party transactions and rehiring. |
| Sherman Tuan | 2007–Present | Director (2007–Present);<br>Compensation Committee (2009–Present);<br>Nom. & Corp. Gov. (2009–Present) | • Lacks independence from Liang;<br>• Faces a substantial likelihood of personal liability for disregarding red flags, failing to implement adequate information systems and permitting SMCI to violate legal obligations for the same reasons as Liang;<br>• Faces oversight liability for Liaw appointment to Board as member of the Governance Committee; |

| Director | Duration | Other Roles | Reason unable to consider a demand |
|---|---|---|---|
| | | | • Beneficiary of insider trading. |
| Tally Liu | 2019–Present | Director (Jan. 2019–Present); Audit Committee (Chair) (2019–Present); Compensation Committee (April 2022–Present) | • Lacks independence from Liang;<br>• Faces a substantial likelihood of personal liability for disregarding red flags, failing to implement adequate information systems and permitting SMCI to violate legal obligations for the same reasons as Liang, as well as due to heightened responsibilities as member of the Audit Committee;<br>• Personal beneficiary of insider trading. |
| Robert Blair | 2022–Present | Director (2022–Present); Audit Committee (May 2024–Present); Governance Committee (2024–Present) | • Faces a substantial likelihood of personal liability for disregarding red flags, failing to implement adequate information systems and permitting SMCI to violate legal obligations for the same reasons as Liang, as well as due to heightened responsibilities as member of the Audit Committee;<br>• Oversight liability for Liaw appointment to Board as member of the Governance Committee;<br>• Beneficiary of insider trading. |
| Judy Lin | 2022–Present | Director (2022–Present); Governance Committee (Chair) (2022–Present); Audit Committee (May 2024–some time in the first half of 2025) | • Faces a substantial likelihood of personal liability for disregarding red flags, failing to implement adequate information systems and |

| Director | Duration | Other Roles | Reason unable to consider a demand |
|---|---|---|---|
| | | | permitting SMCI to violate legal obligations for the same reasons as Liang, as well as due to heightened responsibilities as member of the Audit Committee;<br>• Oversight liability for Liaw appointment to Board as member of the Governance Committee;<br>• Personal beneficiary of insider trading. |

### A. Demand on the Management Directors is Futile

319. Demands on Defendants Liang, S. Liu and Liaw would be futile because they hold management positions at the Company alongside their director roles. In fact, the Company acknowledges in its SEC filings that Defendants Liang, S. Liu and Liaw are non-independent directors.

320. Regardless, all three have breached their fiduciary duties to the Company for failing to maintain an adequate system of internal controls; failing to properly oversee related party transactions; and failing to ensure compliance with export control laws and the SEC Order. In addition, Defendants Liang and S. Liu sold SMCI common stock while in possession of material non-public information.

#### 1. Charles Liang

321. Demand is futile on Defendant Liang because he is not independent—he is the Company's CEO and co-founder. Defendant Liang for years has acted for his own personal interest in myriad ways, prioritizing himself, his family and his loyalists over the best interest of the Company (as described, *e.g.*, *supra* Sections IV.A.2, IV.B.2, IV.C).

322. In addition, Defendant Liang faces a substantial likelihood of personal liability under a Red Flags Claim, an Information Systems Claim and a Massey Claim.

323. First, as the co-founder, CEO and Chair of the Company, Defendant Liang has known of the long history of red flags at the Company since its founding, including at least the following:

- SMCI's guilty plea for violating export control violations (*supra* Section IV.B.1);
- [redacted]
- The termination of high-level SMCI employees due to their involvement in those improper accounting practices, including co-founder Defendant Liaw and former CFO Hideshima [redacted]
- Nasdaq's suspension and delisting of SMCI (*supra* Section IV.B.3);
- SMCI's two years-worth of financial restatements (*supra* Section IV.B.5);
- The SEC's investigation into the Company and the SEC Orders (*supra* Section IV.B.5);
- The appointment of Defendant Weigand as CFO a few months after the entry of the SEC Orders, making him the dual CCO/CFO (*supra* ¶ 95);
- Management and the Audit Committee's efforts to rehire previously terminated employees [redacted]nd for several years thereafter (*supra* Sections IV.C.1, IV.C.5);
- The RPT Policy that for years permitted conflicted transactions with little to no oversight from the Board, particularly the Audit Committee (*supra* Section IV.D);
- [redacted]
- [redacted]
- Defendant Liang's efforts to push employees to prematurely recognize revenue (*supra* Section IV.C.6);
- The *Luong* Complaint's allegations of improper accounting practices and subversion of internal controls (*supra* Section IV.C.4);
- Possible insider trading (*supra* Section V);
- EY's conclusion that completing the audit by the deadline was at "significant" risk due to misconduct by management and the Board including its lack of transparency and EY's inability to rely on management and the Audit Committee's representations (*supra* Section IV.F.2); and
- The Hindenburg Report's public disclosure of accounting misconduct, evidence of undisclosed related party transactions and violations of SEC Order and export restrictions at SMCI (*supra* Section IV.E).

324. [redacted] which eventually caused EY to resign because it did not trust representations from management or the Board (*supra* Sections IV.C.8, IV.F.2).

325. Second, Defendant Liang faces a substantial likelihood of liability for failing to implement adequate information systems at the Company. With Defendant Liang's control over the Board due to his ownership over the Company and the appointment of Liang loyalists, there is effectively no functional reporting system. As described *supra* Section IV.F.2, EY identified this information systems deficiency in resigning as the Company's independent auditor, stating that it could not rely on any representations from management or the Audit Committee. [redacted]

326. Lastly, Defendant Liang faces a substantial likelihood of liability for permitting SMCI to violate its legal obligations. During Liang's tenure as a director, the Board has engaged in misconduct for years that violated the terms of the SEC Orders (which required that the Company cease and desist from violating Sections 17(a)(2) and (3) of the Securities Act of 1933 and the reporting, books and records and internal accounting controls provisions of the Securities Exchange Act of 1934) as described *supra* Section IV.C. In addition, as a member of the Board, Defendant Liang failed to provide sufficient oversight to prevent violations of export control laws, as described *supra* [redacted]

327. Demand is futile on Defendant Liang also because he has received material personal benefits stemming from the underlying alleged misconduct, such as the transactions with Liang Family Entities under the inadequate RPT Policy (*supra* Section IV.D). In permitting the flawed RPT Policy to persist, Defendant Liang also violated the Company's Code of Conduct,

which prohibits situations where "you, or any of your immediate family members, receive improper personal benefits as a result of your position in the Company." In addition, as described *supra* Section V, Defendant Liang has engaged in insider trading.

**2. Sara Liu**

328. Demand is futile on Defendant S. Liu. First, she is not independent—she is the Company's SVP and co-founder. She is also Defendant Liang's wife and is thus a key ally in Defendant Liang's consolidation of power at the Company.

329. Second, demand is futile because Defendant S. Liu faces a substantial likelihood of personal liability under a Red Flags Claim, an Information Systems Claim and a Massey Claim, for the same reasons that Defendant Liang faces a substantial likelihood of personal liability under such claims, as discussed *supra* ¶¶ 323-26.

330. Finally, demand is futile on Defendant S. Liu because she has received material personal benefits stemming from the underlying alleged misconduct, such as those received by Defendant Liang and discussed *supra* ¶ 327. In addition, S. Liu and has personally benefitted from the Company's lack of a functional control environment. She had previously resigned from management due to her role in earnings misstatements, but was later rehired into the Company's executive ranks.[47] In addition, as described *supra* Section V, Defendant S. Liu has engaged in insider trading.

**3. Wally Liaw**

331. Demand is futile on Defendant Liaw, who, as described *supra* ¶ 23, served as a director until January 2018 when he resigned from the Company and the Board in the wake of the Company's accounting scandal only to be rehired in May 2021 as a consultant, returned to a management position in August 2022, and re-appointed to the Board in January 2024.

332. First, Defendant Liaw is not independent—he is the Company's SVP, Business Development and co-founder, and is thus a key ally in Defendant Liang's consolidation of power at the Company.

---

[47] S. Liu retained her role on the Board.

333. Second, demand is futile because Defendant Liaw faces a substantial likelihood of personal liability under a Red Flags Claim, an Information Systems Claim and a Massey Claim, for the same reasons that Defendant Liang faces a substantial likelihood of personal liability under such claims, as discussed *supra* ¶¶ 323-26. Due to his lengthy tenure as a director through January 2018, Defendant Liaw was aware of the red flags involving the export controls felony plea, [redacted] and financial restatements. Having rejoined the Company in May 2021, he became fully aware of all the additional red flags that transpired while he had been away.

334. Finally, demand is futile on Defendant Liaw because he has received material personal benefits stemming from the underlying alleged misconduct, such as those received by Defendant Liang and discussed *supra* ¶ 327. In addition, Liaw has personally benefitted from the Company's lack of a functional control environment: he was rehired despite his role in the previous accounting misconduct [redacted]

**B. Demand on the Audit Committee Director Defendants is Futile**

335. The Audit Committee, as it was comprised of different directors at different times, breached their fiduciary duties of oversight. Like other members of the Board, the Audit Committee failed to heed red flags, establish proper information systems and prevent the Company from violating the law.

336. Members of the Audit Committee have heightened fiduciary duties to the Company. Under the Audit Committee Charter, the Audit Committee is responsible for assisting the Board in fulfilling its oversight responsibilities related to financial accounting and reporting, the underlying internal controls and procedures over financial reporting, the audits of the financial statements and compliance with legal and regulatory complaints. These responsibilities thus encompass ensuring that the Company implements the Remediation Plan and receives approval from an independent auditor regarding its financial accounting controls. The Audit Committee's key responsibilities allow the Company to report out accurate figures in its public filings and disclosures.

**1. Tally Liu**

337. Demand is futile on Audit Committee chair T. Liu because he is not independent—[redacted]. T. Liu's close relationships with Defendants Liang and S. Liu (as well as Defendant Tuan[48]) made him a loyal addition to the Board, particularly given the forced resignation of Defendant Liaw in January 2018 as part of the revenue recognition scandal

338. In addition, as both a member of the Board and the Audit Committee, Defendant T. Liu faces a substantial likelihood of personal liability under a Red Flags Claim for the same reasons that the Management Directors face a substantial likelihood of personal liability under such a claim, as discussed *supra* ¶¶ 323-26.

339. The Audit Committee in particular was responsible for not overseeing management's attempts to rehire previously terminated individuals and for failing to maintain guardrails. As discussed *supra* Sections IV.C.1, IV.C.5, [redacted] raising red flags at multiple junctures across several years. Rather than exercising their independent oversight duties, the Audit Committee, including its chair T. Liu, [redacted]

340. The Audit Committee in particular was also responsible for failing to provide oversight over conflicted transactions with Liang Family Entities in light of the perfunctory post-

[48] Liu has an outside business relationship with Defendant Tuan: the two are investment "angels" of SVT Angels, a non-profit organization that invests in and assists Taiwanese and Silicon Valley start-up companies.

hoc Audit Committee approval process, which the Audit Committee also often neglected to follow, as discussed *supra* Section IV.D.2.

341. [redacted] This deception, among related misconduct, caused EY to resign, concluding prior to its resignation that it was concerned about the Audit Committee and overall Board's ability to "demonstrate and act as an oversight body that is independent of the CEO and other members of management in accordance with Principle 2 of the COSO Framework" and questioning "whether the Company demonstrates a commitment to integrity and ethical values consistent with Principle 1 of the COSO Framework." [redacted] which prompted EY to conclude that completion of its audit by the August 29, 2024 deadline was at "significant risk" in part because of the lack of transparency from management and the Audit Committee—another red flag.

342. Defendant T. Liu also faces a substantial likelihood of liability for an Information Systems claim for the same reasons that the Management Directors face a substantial likelihood of liability for such a claim, as discussed *supra* ¶¶ 323-26. The Audit Committee is particularly responsible [redacted]

343. In addition, T. Liu faces a substantial likelihood of liability for a Massey claim for the same reasons that the Management Directors face a substantial likelihood of liability for such a claim, as discussed *supra* ¶¶ 323-26.

344. Finally, demand is futile on Defendant T. Liu because he has received material personal benefits stemming from the underlying alleged misconduct. As described *supra* Section V, Defendant T. Liu has engaged in insider trading.

**2. Robert Blair**

345. Demand is futile on Defendant Blair, who has served on the Board since December 2022 and the Audit Committee since May 2024. Defendant Blair faces a substantial likelihood of personal liability under a Red Flags claim, an Information Systems claim and a Massey claim for the same reasons that Defendant T. Liu and J. Lin face a substantial likelihood of personal liability under such claims, as discussed *supra* ¶¶ 338-43. As a member of the Board, Blair was aware of the red flags for years but failed in his oversight duties, and upon joining the Audit Committee, he assumed and breached his heightened duties to the Company.

346. In neglecting to properly oversee rehiring, Blair also violated his duties as a member of the Governance Committee to recommend criteria for Board members, including that they "possess the highest personal and professional ethics." For instance, he breached his fiduciary duties and the Governance Charter by considering the reappointment of Defendant Liaw to the Board in 2023 despite the risks posted by Liaw's directorship and his close allegiance to Liang.

347. Finally, demand is futile on Defendant Blair because he has received material personal benefits stemming from the underlying alleged misconduct. As described *supra* Section V, Defendant Blair has engaged in insider trading.

**3. Judy Lin**

348. Demand is futile on Defendant Lin, who has served on the Board since April 2022 and the Audit Committee from May 2024 until sometime in the first half of 2025. Defendant Lin faces a substantial likelihood of personal liability under a Red Flags claim, an Information Systems claim and a Massey claim for the same reasons that Defendant T. Liu and R. Blair face a substantial likelihood of personal liability under such claims, as discussed *supra* ¶¶ 338-43. As a member of the Board, Lin was aware of the red flags for years but failed in her oversight duties, and during her tenure on the Audit Committee, she assumed and breached her heightened duties to the Company.

349. In neglecting to properly oversee rehiring, Lin also violated her duties as a member of the Governance Committee to recommend criteria for Board members, including that they "possess the highest personal and professional ethics." For instance, she breached her fiduciary

duties and the Governance Charter by considering the reappointment of Defendant Liaw to the Board in 2023 despite the risks posted by Liaw's directorship and his close allegiance to Liang.

350. Finally, demand is futile on Defendant Lin because she has received material personal benefits stemming from the underlying alleged misconduct. As described *supra* Section V, Defendant Lin has engaged in insider trading.

**C. Demand on Sherman Tuan is Futile**

351. Demand is futile on Defendant Tuan, who has served on the Board since 2007. First, he lacks independence from management. Defendant Tuan is a longtime member of the Board, having joined at the time of the IPO in 2007, and thus has remained loyal to Defendant Liang for many years. Despite that long tenure, Defendant Tuan has never reined in Defendant Liang or other corporate officers from engaging in misconduct to the detriment of the Company. Tuan also has an outside business relationship with fellow Board member T. Liu, as mentioned *supra* ¶ 337.

352. Second, demand is futile on Defendant Tuan because he faces a substantial likelihood of personal liability under a Red Flags Claim, an Information Systems Claim and a Massey Claim, for the same reasons that Defendant Liang faces a substantial likelihood of personal liability under such claims, as discussed *supra* ¶¶ 323-326.

353. In neglecting to properly oversee rehiring, Tuan also violated his duties as a member of the Governance Committee to recommend criteria for Board members, including that they "possess the highest personal and professional ethics." For instance, he breached his fiduciary duties and the Governance Charter by considering the reappointment of Defendant Liaw to the Board in 2023 despite the risks posted by Liaw's directorship and his close allegiance to Liang.

354. Finally, demand is futile on Defendant Tuan because he has received material personal benefits stemming from the underlying alleged misconduct. As described *supra* Section V, Defendant Tuan has engaged in insider trading.

* * *

355. For the reasons stated above, at least seven of SMCI's directors are unable to disinterestedly and independently consider a demand, and demand is therefore excused as futile.

## VII. COUNTS AGAINST DEFENDANTS

### COUNT I
### Breach of Fiduciary Duty
### (Against the Director Defendants)

356. Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though they were fully set forth herein.

357. The Director Defendants owed fiduciary duties to SMCI and its stockholders, including, without limitation, implementing and overseeing a board-level system to ensure that: the Company maintained effective internal controls over financial reporting; related party transactions, including those with the Liang Family Entities, were monitored, investigated, reviewed, and if appropriate, approved; and the Company's compliance with export control rules was monitored. The Director Defendants had a heightened duty to make good faith efforts in these areas because of the SEC Order, the earlier guilty plea on export control violations, as well as repeated red flags of deficiencies in these areas alleged above.

358. The Director Defendants consciously and repeatedly breached their fiduciary duties and violated their corporate responsibilities by failing to ensure that a reasonable Board-level information and reporting system existed, and failed to actively monitor or oversee those systems, thus disabling the Director Defendants from being informed of risks or problems requiring their attention.

359. Additionally, the Director Defendants had a duty to respond to red flags indicating that the Company's internal controls were failing, that the Company was violating export control rules and that related party transactions were not being properly reported by Company management. While these red flags did reach the Board, the Board ignored them until after the Company had already sustained significant corporate trauma, demonstrating the Director Defendants' bad faith exercise of their fiduciary duties.

360. Finally, Delaware law does not permit fiduciaries to manage a corporation in a manner that knowingly violates positive law or regulatory mandates. Directors breach their duty

of loyalty when they intentionally cause or permit the Company to pursue profit through unlawful means.

361. The Director Defendants, nevertheless, took affirmative steps to thwart the Remediation Plan and violate the SEC Order, disregarded GAAP and related regulatory requirements in order to misstate the Company's financial results, and failed to monitor, prevent and/or approve undisclosed and disclosed related party transactions in contravention of applicable law, accounting rules and Company policy.

362. The Director Defendants knew, or consciously disregarded their duty to know, that this conduct was unlawful and posed significant risk of regulatory sanctions and harm to the Company. Rather than acting to prevent or halt these violations, the Director Defendants tolerated and facilitated them as part of the Company's business operations.

363. As a direct and proximate result of the Director Defendants' conscious failure to perform their fiduciary duties, SMCI has sustained significant damages, both financially and to its corporate image, reputation and goodwill. Such damages to SMCI caused by the Director Defendants' misconduct include, and will include, massive remediation and other operational cost increases, substantial penalties, fines, damages awards, settlements, expenses increased regulatory scrutiny, increased cost of capital and other liabilities. For example, according to its SEC filings, the Company expended $74 million in just one fiscal year that was attributable to the accounting misconduct and related issues.

364. As a result of the conscious and bad faith misconduct alleged herein, the Director Defendants are liable to the Company.

365. Plaintiffs, on behalf of SMCI, have no adequate remedy at law.

**COUNT II**
**Breach of Fiduciary Duty**
**(Against the Officer Defendants)**

366. Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though they were fully set forth herein.

367. The Officer Defendants owed SMCI and its stockholders the highest obligations of due care and loyalty in the administration of the affairs of the Company consistent with the

duties owed by the Director Defendants. This includes a duty of candor, which imposes an unremitting duty on fiduciaries, including directors and officers, to not use superior information or knowledge to mislead others in the performance of their own fiduciary obligations.

368. The Officer Defendants consciously breached their fiduciary duties and/or acted with gross negligence by consciously and repeatedly concealing and/or misrepresenting material information about accounting violations, internal control deficiencies and material facts relating to the re-hiring of employees who had resigned as a result of the SEC's investigation into SMCI from the Company's directors and auditor, EY. In addition, the Officer Defendants consciously breached their fiduciary duties and/or acted with gross negligence by consciously and repeatedly concealing and/or misrepresenting information concerning the Company's significant and material transactions with the Liang Family Entities from the Company's directors and auditor, EY. As a result, the Company's publicly filed financial statements did not fully and timely disclose the extent of the internal control issues and related party transactions.

369. The Officer Defendants knew, or consciously disregarded their duty to know, that this conduct was unlawful and posed significant risk of regulatory sanction and harm to the Company. Rather than acting to prevent or halt these violations, the Officer Defendants tolerated and facilitated them as part of the Company's business operations.

370. As officers of the Company, the Officer Defendants are not entitled to exculpation under Del. Code Ann. tit. 8, § 102(b)(7) (2025) for derivative claims.

371. As a direct and proximate result of the Officer Defendants' conscious and/or grossly negligent failure to perform their fiduciary duties, SMCI has sustained significant damages both financially and to its corporate image, reputation and goodwill. Such damages to SMCI caused by the Officer Defendants' misconduct include, and will include, remediation and other operational cost increases, substantial penalties, fines, damages awards, settlements, expenses, increased regulatory scrutiny, increased cost of capital and other liabilities. For example, according to its SEC filings, the Company expended $74 million in just one fiscal year that was attributable to the accounting misconduct and related issues.

372. As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

373. Plaintiffs, on behalf of SMCI, have no adequate remedy at law.

**COUNT III**
**Breach of Fiduciary Duty for Related Parted Transactions**
**(Against Defendants Liang, S. Liu and Liaw)**

374. Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though they were fully set forth herein.

375. As Board members, officers and SMCI's dominant shareholders, Defendants Liang, S. Liu and Liaw owed to the Company the fiduciary duties of care, loyalty, good faith and candor. The duty of loyalty requires Defendants Liang, S. Liu and Liaw to act in the best interests of the corporation and its stockholders, and avoid conflicts of interest and self-dealing. These duties required them to place the interest of SMCI above their own personal interests. Indeed, the requirement of fairness is unflinching in its demand such that when one stands on both sides of a transaction, that person has the burden of establishing the transaction's entire fairness sufficient to pass the test of careful scrutiny by the courts.

376. Defendants Liang, S. Liu and Liaw consciously breached their fiduciary duties by dictating a fundamentally unfair process that resulted in related party transactions that were not in the best interest of the Company, including by (i) proposing and adopting the facially flawed RPT Policy; (ii) failing to provide sufficient information to the Board and Audit Committee to assess the transactions with the Liang Family Entities pursuant to the RPT Policy; (iii) appointing conflicted members of the Audit Committee to evaluate the transactions; (iv) entering contracts with the Liang Family Entities that restricted SMCI from contracting with other entities for the products manufactured for SMCI by the Liang Family Entities and with other unfair terms; and (v) engaging in billions of dollars of transactions with the Liang Family Entities, motivated by their own financial interests in receiving non-ratable benefits through those entities at the expense of the Company.

377. As officers of the Company, Defendants Liang, S. Liu and Liaw are not entitled to exculpation under Del. Code Ann. tit. 8, § 102(b)(7) (2025) for derivative claims.

378. As a direct and proximate result of Defendants Liang, S. Liu and Liaw's conscious failure to perform their fiduciary duties, SMCI was deprived of the right to engage in transactions based on a fair process and at fair terms and has sustained significant monetary damages in an amount to be determined at trial.

**COUNT IV**
**Unjust Enrichment**
**(Against Defendants Liang, S. Liu and Liaw)**

379. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

380. Defendants Liang, S. Liu and Liaw were unjustly enriched by their wrongful acts at the expense and to the detriment of SMCI as a result of the Company's transactions with the Liang Family Entities.

381. It would be against the principles of equity and good conscience to allow the Individual Defendants to retain these benefits.

382. Plaintiffs, on behalf of SMCI, have no adequate remedy at law.

**COUNT V**
**Breach of Fiduciary Duty under *Brophy***
**(Against Defendants Liang, S. Liu, Clegg, Kao, Weigand, Blair, Fairfax, T. Liu and Tuan)**

383. By reason of their fiduciary duties as officers or directors of SMCI, the Selling Defendants specifically owed and continue to owe SMCI the highest obligation of due care, good faith and loyalty.

384. When the Selling Defendants sold their SMCI common stock during the Relevant Period, they were in possession of material, non-public information described above and sold SMCI stock because each of them was motivated, in whole or in part, by the substance of such information. In addition, to the extent any such sales occurred pursuant to a Rule 10b5-1 trading plan, such plan was entered into while each of them was in possession of material, non-public information described above, and entered into such plans because each of them was motivated, in whole or in part, by the substance of such information.

385. Certain of the insider sales made by Defendants Liang, S. Liu and Weigand occurred pursuant to a public offering of SMCI common stock on December 5, 2023.

386. The information described above was proprietary, non-public information concerning the Company's business operations, financial condition, financial statements and growth prospects. The Selling Defendants misappropriated that information, which was a proprietary asset belonging to the Company, to their own benefit when they sold holdings in SMCI common stock.

387. The Selling Defendants knew that this information was not intended to be available to the public. Had such information been generally available to the public, it would have significantly reduced the market price of SMCI common stock.

388. The Selling Defendants' sale of SMCI stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith. The Selling Defendants are therefore liable to the Company for insider trading.

389. Because the use of the Company's proprietary information for personal gain constituted a breach of the fiduciary duties of the Selling Defendants, the Company is entitled to disgorgement and/or the imposition of a constructive trust on any profits obtained thereby.

390. Plaintiffs, on behalf of SMCI, have no adequate remedy at law.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

(a) determining that this action is a proper derivative action maintainable under the law and that demand is excused;

(b) finding that the Officer and Director Defendants consciously breached their fiduciary duties by failing to make a good faith effort to implement and oversee effective internal controls;

(c) finding that Defendants Liang, S. Liu and Liaw consciously breached their fiduciary duties by causing the Company to enter transactions with the Liang Family Entities in order to obtain non-ratable benefits;

(d) finding that Defendants breached their fiduciary duties by causing the Company to violate its obligations under positive law, including its obligations under the SEC Orders and under export control laws;

(e) finding that the Officer Defendants acted with, at a minimum, gross negligence;

(f) finding that Defendants Liang, S. Liu and Liaw were unjustly enriched;

(g) finding that the Seller Defendants consciously breached their fiduciary duties by selling their SMCI common stock while in possession of material, non-public

information and because each of them was motivated, in whole or in part, by the substance of such information;

(h) against all Defendants other than Defendants Kao and Clegg and in favor of the Company for the amount of any and all damages sustained by SMCI as a result of Defendants' breaches of fiduciary duties, including any and all damages compensable by statute and/or law;

(i) directing the Director Defendants to take any and all necessary actions to enhance the Company's governance to comply with applicable laws and to protect SMCI and its stockholders from repeating the harms described herein;

(j) providing injunctive relief, including the implementation of robust oversight mechanisms to address and avoid future instances of the improper practices complained of herein;

(k) awarding to SMCI restitution from all Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants, including payment of unvested equity-based compensation;

(l) awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants', consultants' and experts' fees, costs and expenses; and

(m) granting any and all further relief as the Court deems just and proper.

Dated: January 30, 2026

Respectfully submitted,

**BERMAN TABACCO**

By: */s/ Nicole Lavallee*
Nicole Lavallee (SBN 165755)

Caitlyn Barresi (SBN 357977)
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
nlavallee@bermantabacco.com
cbarresi@bermantabacco.com

Nathaniel L. Orenstein (*pro hac vice* forthcoming)
Quentin Morgan (*pro hac vice* forthcoming)
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
norenstein@bermantabacco.com
qmorgan@bermantabacco.com

*Attorneys for Plaintiff Employees' Retirement System of the State of Rhode Island*

**COHEN MILSTEIN SELLERS & TOLL PLLC**

Julie Goldsmith Reiser (*pro hac vice* forthcoming)
1100 New York Avenue, N.W., Suite 800

Washington, D.C. 20005
Telephone: (202) 408-4600
jreiser@cohenmilstein.com

Richard A. Speirs (*pro hac vice* forthcoming)
Alexandra Gray (*pro hac vice* forthcoming)
88 Pine St., 14th Floor
New York, NY 10005
Telephone: (212) 838-7797
rspeirs@cohenmilstein.com
agray@cohenmilstein.com

Christina D. Saler (*pro hac vice* forthcoming)
100 N. 18th Street, Suite 1820
Philadelphia, PA 19103
Telephone: (267) 479-5707
csaler@cohenmilstein.com

*Attorneys for Plaintiff Bucks County Employees' Retirement System*

# VERIFICATION TO SHAREHOLDER'S DERIVATIVE COMPLAINT

I, Eileen K. Cheng, General Counsel, Office of the General Treasurer on behalf of the Employees' Retirement System of the State of Rhode Island ("ERSRI"), hereby declare and verify that ERSRI is a shareholder of Super Micro Computer, Inc. as alleged in the attached Verified Shareholder Derivative Complaint ("Complaint"). I have reviewed the Complaint and authorized its filing on behalf of ERSRI. I verify that as to those allegations in the Complaint of which I have personal knowledge, I believe those allegations to be true to the best of my knowledge, information, and belief. As to those allegations in the Complaint of which I do not have personal knowledge, I believe those allegations to be true, based on the discussions with and reliance upon my counsel and to the best of my knowledge, information, and belief.

ERSRI has not received, been promised or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting this action or serving as a representative party in this action except: (i) such fees, costs, or other payments as the Court expressly approves to be paid to ERSRI; or (ii) reimbursement, by its attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 16, 2026

Eileen K. Cheng
General Counsel
Office of the General Treasurer *on behalf of the Employees' Retirement System of the State of Rhode Island*

**VERIFICATION TO SHAREHOLDER'S DERIVATIVE COMPLAINT**

I, Robert J. Harvie, Jr., the Board Chair of the Bucks County Employees' Retirement System ("Bucks County"), hereby declare and verify that Bucks County is a shareholder of Super Micro Computer, Inc. as alleged in the attached Verified Shareholder Derivative Complaint ("Complaint"). I have reviewed the Complaint and authorized its filing on behalf of Bucks County. I verify that as to those allegations in the Complaint of which I have personal knowledge, I believe those allegations to be true to the best of my knowledge, information, and belief. As to those allegations in the Complaint of which I do not have personal knowledge, I believe those allegations to be true, based on the discussions with and reliance upon my counsel and to the best of my knowledge, information, and belief.

Bucks County has not received, been promised or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting this action or serving as a representative party in this action except: (i) such fees, costs, or other payments as the Court expressly approves to be paid to Bucks County; or (ii) reimbursement, by its attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 18, 2025

Robert J. Harvie, Jr.
Board of Commissioners, Chair
Bucks County Employees' Retirement System